JOHN G. LYNN, and others, *vs.* THE MOUNT SAV-
AGE IRON COMPANY and THE CUMBERLAND AND
PENNSYLVANIA RAILROAD COMPANY.

*Construction of an Agreement—Covenant not Running
with the Land — Covenant restrictive of Trade —
Action for Breach of Covenant — When maintain-
able — When the Specific execution of a Covenant
will be denied — When the Assignee of land will be
restrained in its Use and occupation—Parties to a
Suit in Equity—Equity Practice—Practice in the
Court of Appeals.*

The M. S. Company possessed very extensive manufacturing and mining
powers, and the franchise of making and operating a railroad or rail-
roads, beginning the same at or near its mines or manufactories, and
running to a convenient point or points at or near Cumberland, or to
such other point or points as should best suit its convenience and inter-
est. It had also the power of purchasing and holding all such property
as it might require, and to make and enter into all manner of contracts
in relation to the business and property aforesaid. The company pur-
chased land in the valley of Jennings' run, and erected iron-works
thereon. It built a railroad leading thence to the depot of the Balti-
more and Ohio Railroad Company at Cumberland, and with a branch
thereof up to certain coal mines in the valley of Braddock's run. L
possessed lands fronting on the Potomac river above the dam of the
Chesapeake and Ohio canal at Cumberland, on which he desired to erect
wharves for the accommodation of the coal trade, and other trade of the
canal. In 1849, it was agreed between L and the M. S. Co., that L
should grant, and he did grant to the company the right to extend its
railroad to the river front of his lands, and to erect wharves along a
portion thereof, with other improvements necessary for the accommoda-
tion of all coal, iron, lumber and other articles which might be brought
thither for shipment on the canal. It was further agreed, that the pro-
perty reserved by L, should not be used in any manner to compete with
the company in its transportation of coal from the region of Braddock's
and Jennings' run. But this stipulation was not to affect his right to
use this reserved property for purposes of the coal trade from the West-
ernport region; and the company covenanted on its part to make the
terminus of its road on said land its only terminus on the canal or its

Lynn, *et al. vs.* Mount Savage Iron Co., *et al.*

basins, and not to extend the present terminus of its road at the depot of the Baltimore and Ohio Rail Road, any further than it was then. The wharf and other improvements contemplated by the agreement were made and operated. In 1854, the M. S. Co., sold its railroad, with its right acquired under the agreement, to the C. and P. R. R. Co., which extended the railroad by several stages into the valley of George's creek and down to Westernport, and was at the time of filing the bill, conveying coal from the Westernport region over its extended road, and the original road of the M. S. Co., to its terminus at the depot in Cumberland, and thence to the wharf of M. & W., on a basin of the canal, where it was delivered for further transport on the canal. HELD:

1st. That the transport over its road by the M. S. Co., and delivery at the wharf of M. & W., of coal mined in the Westernport region, would not have been a breach of its contract to make the terminus of its road on L's land, its only terminus on the canal or its basins.

2d. That this covenant did not run with the land and easement granted, into the hands of the C. and P. R. R. Co., as assignee of the M. S. Co.

3d. That the covenant being restrictive of trade and in the nature of a monopoly, would not be specifically enforced in Equity against either company. *Quære?*

4th. That L would have his right of action against the M. S. Co., for a breach of covenant, if such had been committed, but he could not have the covenant specifically executed. If any attempt were made by the assignee of the M. S. Co., to use and apply the wharf and other improvements on the land of L, in a manner and to a purpose different from that intended, a Court of Equity would restrain such improper use and appropriation. In such case, the question would be, not whether the covenant ran with the land, but whether the party should be allowed to use and appropriate the land in a manner wholly at variance with the contract entered into by its assignor, and with notice of which it purchased.

5th. That if the bill had stated a case for equitable relief, the canal company and M. & W., would have been necessary parties thereto.

Declared as settled practice, that on a motion for an injunction, made or submitted after filing of the answer, the answer is to be read ; and that where all the circumstances forming the equity of the bill are denied by the answer, the injunction ought to be refused.

The bill asking in the alternative a rescission of the agreement, the cause was remanded for further proceedings.

APPEAL from the Circuit Court for Allegany County, in Equity.

The material allegations of the bill of complaint in this case, which was filed by the appellants against the appellees, are stated in the opinion of the Court. The object of the bill was to enforce a specific execution of certain covenants entered into by the appellee, the Mount Savage Iron Company of Allegany county, with some of the appellants and those who are represented by the others of them, dated the 8th of September, 1849, and to obtain an injunction to restrain said company, and the other appellee, the Cumberland and Pennsylvania Railroad Company, from the further alleged violation of such covenants. In the agreement of the 8th of September, 1849, it was recited that the appellants, (or more strictly speaking, the parties thereto, whose interests are represented by the appellants,) owned and possessed a certain piece of land lying between the Potomac river and Flat street, in the town of Cumberland, and upon which they were desirous to have erected wharves and other improvements, which would afford proper facilities for the accommodation of the coal and all other trade on the Chesapeake and Ohio canal. They agreed to grant and convey to the Mount Savage Iron Company in perpetuity, the right of way for a railroad, with as many tracks as might be required, through their land lying between the points aforesaid, together with as much land for the contemplated depot on the Potomac river as might be required for the accommodation and protection of the engines and machinery, used in working said road.

The parties mutually agreed that the wharves, slips and other improvements therein contemplated, should be erected from time to time, as the demand and necessity of the trade might require. They further declared that the improvements thereby contemplated to be made, were the construction and erection of such wharves, slips and all such improvements as might be necessary to accommodate with wharfage, and facili-

ties for transshipment of all coal, iron, lumber and all other articles, materials and things which might be brought to said wharves for shipment upon the canal, and also for wharfage and transshipment of merchandize and all other property received by the canal. The wharves were to be made at the joint expense of the parties to the agreement, and the wharfage was to be divided between them; the railroad was to be extended, and the other improvements were to be made at the cost of the company.

The bill being laid before his honor, Judge PERRY, he passed an order requiring the defendants to show cause, by a day therein named, why an injunction should not issue as prayed.

The Cumberland and Pennsylvania Railroad Company thereupon filed a voluminous answer, in which it denied that the agreement of 1849, professed to oblige the Mount Savage Iron Company to make the wharves erected on the lands of the appellants, its depot for any other freights than coals brought over its road from the Jennings' and Braddock's Run region. It denied as fact that the respondent had delivered coals, brought from said region, elsewhere than at such wharves. As matter of law, it denied that such covenant was binding on the respondent as the assignee of the Mount Savage Iron Company. It insisted that the Chesapeake and Ohio Canal Company and Thomas J. McKaig and William Walsh were interested in the event of the suit, and as such, were necessary parties thereto; it relied on other defences, which are sufficiently disclosed by the argument of the counsel for the appellees.

On the 27th of November, 1870, an order was passed overruling the motion for an injunction. The order recites that the motion was submitted "without argument on the merits thereof," and that the order was passed "with consent of the parties and *pro forma.*"

From this order the complainants appealed.

The cause was agued before BARTOL, C. J., STEWART, BRENT, MAULSBY, GRASON, MILLER and ALVEY, J.

*Thomas S. Alexander* and *William Schley*, for the appellants.

The fate of this appeal must depend on the construction which is given to the last covenant in the agreement of 1849, to wit:

"And the said Mount Savage Iron Company further agrees and binds itself to make the terminus of its road on said piece or parcel of land its only terminus on the Chesapeake and Ohio Canal or its basins, and not to extend the present *terminus* of its road at the present depot of the Baltimore and Ohio Railroad Company in Cumberland, any further than it is now." Now, the expression "terminus," when used in reference to railroad or canal transportation, denotes that point on the line of the railroad or canal where transportation over the same habitually ceases, and where the freights carried are habitually delivered over to the owner or consignee thereof, or to some other carrier for further transportation. And the obvious meaning of the parties to the covenant was, that the company should not have any place for the delivery of freights brought over its railroad, for further carriage on the canal, other than the wharf about to be erected on the lands of the appellants, and, especially, should not extend its transportation in the direction of its existing railroad beyond its then terminus at the depot of the Baltimore and Ohio Railroad in Cumberland. It was not the construction of another track of railroad, or the building of another wharf, which was forbidden, but the habitual use of any other railroad track leading to any other wharf, and the use of such other wharf for the delivery of freights which would otherwise be carried to and delivered from the wharf to be so constructed on the lands of the appellants. Upon this hypothesis there can be little difficulty in concluding that the use by the company of the track of the Baltimore and Ohio Railroad Company, connecting its terminus in Cumberland with the wharf of McKaig & Walsh,

for the habitual delivery on the canal of freights brought over its railroad, and which, by the agreement between the parties, ought to be delivered on the wharf built on the land of the appellants, is an evasion of the said agreement.

But it is said that the coals delivered at the wharf of McKaig and Walsh were brought from the Westernport region, over a line of which the railroad of the Mount Savage Iron Company formed a small part, and that the covenant in question, when taken, as it should be, in connection with other stipulations in the agreement, obliges the company to deliver at the wharf, on the land of the appellants, none other than coals which should have been mined in the Braddock's and Jennings' run region and brought over the line of railroad of the Mount Savage Iron Company exclusively. Clearly, the letter of the covenant is not susceptible of such a contracted interpretation. The company is to have no other "terminus" or place for the delivery of its freights intended for transportation over the canal. The company will not deliver elsewhere any of its freights intended to be passed over the canal. The letter is as simple, general, and comprehensive as language can make it; so much so as to relieve the appellants from the necessity of invoking aid from the maxim, that where the letter of a covenant is equivocal, it is to be taken most strongly against the covenantors.

Again—the agreement opens with the concession to the company of an easement to extend its railroad over the lands of the appellants to the water front, and there to erect wharves for the convenient delivery of "all trade seeking said wharves from time to time," for further carriage over the canal. The grant and the covenants are, therefore, mutual and dependent on each other—the one constituting the consideration for the other. And the obvious intent of the covenant was to oblige the company to exercise, in their fullest extent, the easements which were conceded to it. And the equity of this provision is the more apparent, as the wharves were to be built and maintained at the common expense of the appellants and the

company, and the wharfages were to be shared between them. If we can find anything in the grant itself, or in other clauses of the agreement which affects to restrain the company in the exercise of its easements to any particular description of traffic, we agree that the general words of the covenant must be subjected to a like limitation. But we shall violate the clearest maxims of interpretation, by so construing the grant as to confer on the company the right of exercising its easements for every description of traffic, and at the same time so restricting the letter of the covenant as to impose on the company the duty of using its easements for a particular description of traffic only. There would be no mutuality in such agreement. If, then, we recur to the grant itself, we shall find its language is as general as it could well be made. As already suggested, the wharves to be erected are such as may be necessary for " all trade seeking said wharves from time to time," for delivery on the canal. And in a further article of the agreement, as if to remove all pretexts for misconstruction, the parties declare their objects to be " the construction and erection of such wharves, slips, and all such improvements as may be necessary to accommodate with wharfage and facilities for transshipment of all *coal, iron, lumber,* and *all other articles, materials* and *things* which may be brought to said wharves for shipment " on the canal.

Can we collect from the context of the entire agreement, a general intent at variance with the particular intent, which is evidenced by the letter of the grant and its dependent covenant? This question would seem to be easy of solution. Large outlays being contemplated to establish a suitable terminus on the land of the appellants, economy and convenience were to be promoted by the use of that terminus for all the purposes of the company's traffic, and the interests of the appellants in like manner were to be advanced by the most extensive use of that terminus.

It is impossible to imagine a motive inducing the appellants to insist on restricting the company in its use of the ter-

minus, or the company to consent to any such restriction. Certainly, there is no motive so apparent as to justify us in overruling the general expressions of the grant and covenant.

But we shall be referred to another clause whereby the appellants stipulate " that the other property belonging to them, and binding on the Potomac, shall not be used  *  *  *  in a manner or for a purpose to compete with the Mount Savage Iron Company in the transportation of coal from the region of Braddock's and Jennings' run, and in opposition to or in competition with or diminution of the value of the wharfage and improvements herein contemplated, so far as the same depend on or are connected with said transportation of coal from said region."

" This stipulation is in no way to limit or affect their right to use, sell or convey said other property for  *  *  *  purposes connected with the coal trade from the Westernport region, and other trade on said canal and river, and the Baltimore and Ohio Railroad west of Cumberland and not from the Braddock's or Jennings' run region; the object of the restriction above stated being merely to prevent rivalry and competition and thereby diminished profits from the transportation and wharfage of the coal from the said Braddock's and Jennings' run region." This stipulation, it will be insisted, shows that an extension of the railroad of the company into the Westernport region was not contemplated at the date of this agreement. It professes to secure to the company a monopoly in the carriage of coals from a limited district, and the subsequent covenant is to be restricted so as to impose on the company the duty of exercising that monopoly.

Now there is no covenant on the part of the company that it will not encroach on the traffic from the Westernport region, which it is supposed was intended to be secured to the appellants. It was a matter of no moment to the appellants whether the coals from the Westernport region were to be delivered at the wharves to be erected under this agreement, or at other wharves which should thereafter be erected on the

lands reserved by the appellants. Hence there was no necessity for a covenant to prevent competition between the parties in regard to the trade from this region. And every advantage, which could be hoped for in reason, was fully provided for by the covenant that the company should have no other terminus for delivery of freights brought over its road. It may be that the *casus* of a future extension of the road was not present in the mind of the parties at the date of the agreement. It may be that they contemplated as more probable the delivery of coals and other freights brought down the river, at wharves to be erected on the lands reserved by the appellants. What would have been the conclusion of the parties if their attention had been addressed to the contingency of an extension of the road? Would the company have accepted an easement limited only to the carriage of coals from the Jennings' and Braddock's run region? Would the appellants have consented that the coals to be brought by means of such extension from the Westernport region should be landed at any other terminus than the wharves about to be erected? If the letter of the grant and of the covenant embraces, by reason of its universality, the supposed *casus omissus*, then we insist that this letter is not to be curtailed in its proportions to gratify the letter of another stipulation, whose special object was to secure to the company a monopoly in the transport of coals which were at that moment finding their way to another terminus. We insist that such was its only object. The appellants covenant that they will not so use its reserved lands as to draw off any part of the traffic of the company in the coals of the named district. And it declares expressly, with the view of excluding the possibility of an adverse conclusion, that it proposes to use those lands for the purposes of other traffic. But there is nothing in any part of the entire agreement from which it can be inferred that the views entertained by the parties, were adverse to the practicability or probability of an extension of the railroad into the Westernport region. As matter of fact, it is denied

that such an extension was deemed impracticable by the public generally, or by either of the parties to the agreement. And, as matter of law, it is denied that the construction of the agreement in respect to the grant of the easement or covenant for its user is to be affected by evidence of such supposed opinions, or of the supposed want of authority of the company to make such extension. In *East Lancashire Railway Co. vs. Lancashire and Yorkshire Railway Co.*, 25 *Eng. L. & Eq.*, 465, it appeared that the A. company had constructed a railroad from M., northward, of considerable extent. The B. company was incorporated with power to build a railroad of some ten miles, leading from M. to a neighboring village. The two companies agreed that the B. company should connect its road leading from the village with the road of the A. company at a point some five miles from M., and should use the road of the A. company between the point of junction and M., and its depot at M., for the general purposes of its business. The B. company made its road, and then, under several acts of parliament subsequently passed, made several extensions of its little road so that at length it rivalled in extent and amount of traffic, the road of the A. company, and it then became a question whether the B. company had a right under the agreement, to use the railroad and depot of the A. company for the purposes of this increased traffic? It was agreed on the part of the A. company, that neither party had contemplated the possibility of so great an extension of the road of the B. company, and that the concession made to a neighborhood road to facilitate the transaction of its very limited business, was very different from the concession of like privileges to a company which had assumed a position amongst the great carriers of the nation. But it was answered and so adjudged on error, that the concession, in terms extended to all freight which might be carried over the original line of the B. company, and that it could make no difference to either company whether the freights delivered at the original terminus of the B. road

were brought there by the ordinary trains of the country, or by railroad made by the B. company or by another company, and especially as the compensation to the A. company would be measured by the use made of its road and depot. Now this case, and especially the reasoning of the Court, is a direct authority in favor of the right of the Mount Savage Iron Company to use its road made through the lands of the appellants, and the wharves to be erected at the terminus thereof, for the delivery of all freights which should be brought over its road, and equally so in favor of the right of the appellants to insist that all freights brought over the road of the company, should be delivered at that terminus. To the appellants, clearly, it was of no moment to inquire whether the freights so delivered were supplied by the mines opened on the line of the original railroad of the company, or were brought to that road over other roads leading from more distant points. And if the easement may be so exercised, the appellants ought to have the right to insist that it shall be thus exercised. The present case is indeed stronger than the case referred to, since, in the present, the company is availing itself of a contingency which the argument on the other side supposes was not contemplated, to deprive the appellants of the profits of a traffic which the same argument supposes would, of necessity, be landed at the reserved lands of the appellants. Thus far we have conceded that the company, at the date of the agreement, had no power to extend its railroad into the valley of George's creek. Now, we insist that the company had the power to buy coal lands or ore deposits in that valley, and to connect them by railroad with its factories at Mount Savage. The road thus extended would be open for the public use. The company has, by the very letter of its charter, the power to extend its railroad in any and every direction as its own convenience might render expedient, and, in this respect, the present case differs from the case referred to, where the extensions were made under additional parliamentary grants. See *Turner vs. Evans,*

*2 E. & B.*, 512; *Brampton vs. Beddoes*, 13 *C. B.*, (*N. S.*,) 538; *Dunlop vs. Gregory*, 10 *N. Y.*, 241; *Davis vs. Barney*, 2 *G. & J*, 382.

The covenant was and is binding on the Mount Savage Iron Company, being founded on a valuable consideration, and not inconsistent with the provisions of its charter, and not violative of any rule of public policy. *Rigby vs. Great Western Railway Co.*, 4 *Railway Cases*, 175; *Shrewsbury Co. vs. London Co*, 2 *McN. & G.*, 324; *Earl Lindsay vs. The Great Northern Railway Co.*, 10 *Hare*, 664; *Lancaster Co. vs. North Western Co.*, 2 *K. & J.*, 293; *Mayor, &c. of Balto. vs. Balto. & Ohio R. R. Co.*, 21 *Md.*, 50; *Eastern Co. vs. Haukes,* 5 *H. L. Cases*, 370; *Shrewsbury Co. vs. N. W. R. Co.*, 6 *H. L. Cases*, 135, 136; *South Yorkshire Co. vs. Great N. R. Co.*, 9 *Exch.*, 75.

The Cumberland and Pennsylvania Railroad Company claims to have acquired by assignment all the interest of the Mount Savage Iron Company in its railroad, and in the agreement between that company and the appellants. At the same time it denies its obligations to perform the covenants entered into by its assignor, and which formed the consideration for the concessions made by the appellants to the Mount Savage Iron Company.

The appellants are disposed to stand by the agreement in its entirety, they are quite content to accept any one as the representative of the Mount Savage Iron Company, who will assume the responsibilities cast by the agreement on that company. But in view of the pretences set up, they are impelled by a duty of self-preservation to question the right of the Cumberland and Pennsylvania Railroad Company to represent the Mount Savage Iron Company, as a party to the agreement between them and that company. The agreement is made with the company only and not with or for its assigns. It contemplated the exercise by the company of franchises, which, at the date of the agreement, were incapable of assignment. The agreement is unlimited in duration

by its letter. But it is quite apparent, that the burthens imposed on the lands of the appellants were to continue so long only as the Mount Savage Iron Company was in a position to discharge its reciprocal obligations; that is to say, so long as it could avail itself of the easements conceded in the manner provided for by its charter. But an easement to be exercised under the provisions of one company, is not identical with an easement to be exercised by another company under the provisions of a distinct charter. Nor was it possible for the State, by an Act passed since the date of the agreement, to empower the Mount Savage Iron Company to sell to another company an easement which was peculiar to itself, and when originally created was incapable of assignment.

The covenant in question is not a covenant in gross. An easement is an estate, and a covenant defining the manner in which an easement over land is to be enjoyed, runs with the easement as closely as a like covenant would run with land, to the enjoyment of which it is attached. *Balley vs. Wells*, 3 *Wils.*, 25 ; *Earl of Portmore vs. Bunn*, 1 *B. & C.*, 694.

The covenant, so far as it relates to the railroad over the land of the appellants, and the erections thereon, runs with the land or easement thereon. To this extent, at least, it certainly touches or concerns the land over which the easement is granted. And therefore it may be assumed that coal which is brought by the assignee on this section of the railroad, and intended for transportation on the canal, must be discharged from the wharves at the other extremity of this section of the railroad.

The only question therefore will be whether the same covenant runs with or is appurtenant to so much of the railroad as lies beyond the lands of the appellants ; and in this connection it is to be noted that the covenant is substantially this, that coals brought on the railroad at its western extremity, for transportation over the canal, shall be discharged on the canal from the wharves constructed on the lands of the appellants. *Hemingway vs. Fernandes*, 13 *Sim.*, 228 ; *Vyvyan vs. Arthur*,

1 *B. & C.*, 410; *Bristow vs. Wood*, 1 *Coll.*, 480; *Western vs. McDermott, L. R.*, 1 *Eq.*, 499.

But in equity the question whether the covenant runs with the land yields to the broader question — is its observance essential to the protection of the interests for the benefit of which it was entered into? *Fulk vs. Moxhay*, 2 *Phill.*, 774; *Patchen vs. Dubbins*, 23 *L. & Eq.*, 609; *Whatman vs. Gibson*, 9 *Sim.*, 196; *Clements vs. Wells, L. R.*, 1 *Eq.*, 200; *Fielden vs. Slater, S. P., L. R.*, 7 *Eq.*, 523; *Wilson vs. Hart, L. R.*, 1 *Ch.*, 463; *Catt vs. Fowle, L. R.*, 4 *Ch.*, 654; *Morland vs. Cook, L. R.*, 6 *Eq.*, 252; *Thruston vs. Minke*, 32 *Md.*, 488.

Is the covenant to be avoided as in restraint of trade, because the covenanting party has discerned that it may effect a delivery of its freight over another route at a less cost to itself, or because at this moment the proprietors of another wharf offer facilities to the coal owners, at rates somewhat less than are charged for like facilities, at the wharves on the lands of the appellants? It is not shown that the charges made by the latter are excessive, nor even that those charged by Messrs. Walsh & McKaig, are remunerative or likely to be permanent in the event of the breaking up the wharves on the land of the appellants. This Court has held that a contract in restraint of trade would be enforced if founded on good consideration, and induced by a reasonable view of the interests of the parties. *Guerand vs. Dandelet*, 32 *Md.*, 561.

*William Walsh* and *Thomas J. McKaig*, for the appellees.

The bill has not brought all the parties in interest in the decision of the case, before the Court: William Walsh and Thomas J. McKaig, whose wharf would be destroyed by granting the relief prayed, ought to have been made parties, as also the American Coal Company, the Central Coal Company, and the Chesapeake and Ohio Canal Company, which are all interested in the granting the prayer of the bill, and to grant it, would greatly injure each of them and directly violate the interest and rights of each. *Gregg, et al. vs. Mayor,*

&c., *of Balt.*, 14 *Md.*, 479 ; *Story's Eq. Pl.*, sec. 75 ; 1 *Bland*, 292 ; *Shields vs. Banoll*, 17 *Howard*, 145 ; *Calvert on Suits in Equity*, 113–116, (*in* 17 *L. L.*;) 9 *Hall*, 284–289 ; *Kerr on Injunctions*, 551 ; 16 *Vesey*, 324, *side*.

The Court should not grant the injunction for want of a full and fair disclosure in the bill by averments and exhibits. *Nesbaum vs. Stein*, 12 *Md.*, 315 ; *Keighler vs. Savage M. Co.*, 12 *Md.*, 383 ; *Canton Co. vs. Northern Cent. R. Co.*, 21 *Md.*, 398 ; *Hankey vs. Abrams*, 28 *Md.*, 588.

The Cumberland and Pennsylvania Railroad Company showed cause against the injunction by filing its answer under oath by the day fixed. There was no replication filed or testimony taken, and the Court in passing on the right to the injunction, must give full effect both to the denials of the answer and all matters of avoidance. *Mason vs. Martin and Kemp*, 4 *Md.*, 124 ; *Story's Eq. Pl.*, 871, note 1 ; *Barroll's Ch. Pr.*, 144 ; *Hall vs. McPherson*, 3 *Bland*, 529 ; 2 *Saundf. S. Ct. Rep.*, 675 ; *Bell vs. Purvis*, 15 *Md.*, 22 ; 3 *Minnesota*, 217.

Neither injunction nor specific performance are a matter of right, but rest in the sound discretion of the Court, having full regard to all the circumstances of the case, the duties and positions of the parties, and the nature of the interests to be affected. *Nesbaum vs. Stein*, 12 *Md.*, 315 ; *Reddall vs. Ryan, et al.*, 14 *Md.*, 444 ; *State vs. Jarrett & Harwood*, 17 *Md.*, 309 ; *Canton Co. vs. North. Cent. RR. Co.*, 21 *Md.* 398 ; *Waters vs. Howard*, 8 *Gill*, 261 ; *Wadworth vs. Manning, et al.*, 4 *Md.*, 59 ; *Williams vs. Earl of Jersey*, 1 *Craig & Phil.*, 91 ; 2 *Story's Eq.*, sec., 959, *a;* 2 *Johns Ch.*, 282 ; *Kerr on Injunctions*, 209, 210, 213.

Preponderance of inconvenience is sufficient to cause the refusal of an injunction, and where the right asserted is doubtful, or not very clear, the Court will not grant an injunction to disturb the enjoyment of property or franchises. *Attorney General vs. The Mayor & C. of London*, 1 *Mylne & Craig*, 171 ; *Greenhalgh vs. Manchester and Birmingham Rail-*

*way Co.,* 3 *Mylne & Craig,* 798 ; *Bacon vs. Jones,* 3 *Mylne & Craig,* 433 ; *Cory vs. The Yarmouth & Norwich Railway Co.,* 3 *Hare.,* 593.

Looking at the case as presented on bill and answer, and at the character of the Cumberland and Pennsylvania Railroad Company, as a railroad corporation holding public franchises, and bound to the public to use those franchises for the increase of trade and commerce, and looking to the interests of the Chesapeake and Ohio canal, and other parties that would be affected by the injunction, the complainants ought not to have the remedy they ask.

The contract on its face states that the road provided for therein to be made from the Maryland Mining Company's road, to the piece of land for the wharf, was "to be laid out at present with one track, and to be supplied hereafter with as many other tracks as the accommodation of all trade *seeking* said wharves from time to time render necessary." And that the improvements to be made on the lands are wharves, slips, &c., "to accommodate with wharfage, and facilities for transshipment of all coal, iron, lumber and all other articles, materials and things which *may be brought* to said wharves for shipment, &c."

The contract in its terms only applies to trade *seeking* the wharves to be built under it, and to articles which *may be brought* to said wharves for transshipment. This contract surely leaves the *shipper free* to send his coal and other articles to any other wharf; to *seek* or *bring* his trade or articles where he pleases for transshipment. This contract surely did not bind the Mount Savage Company to *compel the shipper to seek,* or *bring,* his trade or merchandise to the wharf or wharves provided for in the agreement.

The Court will notice that no coal whatever is taken from the mines of the Mount Savage Company, or Jennings' run, and that all the coal from Braddock's run region comes to Cumberland by the Maryland Mining Company's road ; and that all the coal that goes to Walsh & McKaig's wharf comes

from the George's creek region, west and south of Frostburg, or what is known as the Westernport coal, that looked for its outlet by the Baltimore and Ohio Railroad and the George's Creek Railroad.

The contract has this provision : "And the said parties of the first part do hereby further agree and bind themselves that the other property belonging to them and binding on the Potomac river shall not be used by them or by any other person or company in a manner or for a purpose to compete with the *Mount Savage Company in the transportation of coal from the regions of Braddock's and Jennings' run,* and in opposition to, or in competition with, or diminution of, the value of the wharfage and improvements herein contemplated, so far as the same depend on or are connected *with said transportation of coal from said region.*"

"This stipulation is in no way to limit or affect the right of said parties of the first part to use, sell or convey said other property for wharves, warehouses, coal yards, or other purposes connected with the coal trade from the *Westernport region* and other trade on said canal and river and the Baltimore and Ohio Railroad *west of Cumberland, and not from the Braddock's or Jennings' run region.* The object of the restriction above stated being merely to *prevent rivalry and competition,* and thereby *diminished profits from the transportation and wharfage of the coal from said Braddock's and Jennings' run region.*"

This contract cannot be applied to coal coming from the George's creek or Westernport region. The complainants here expressly reserve the right to use and sell their other property on the Potomac, for wharves and warehouses, &c., connected with the coal trade *from the Westernport region,* and only bind themselves not to use it so as to compete with the profits and wharfage on coal transported from the *Braddock's and Jennings' run region.* In other words, the agreement plainly relates to and provides for the coal to come over the road from the Braddock's and Jennings' run region, and as

plainly excludes the coal to come from the Westernport region, and leaves the complainants free to provide on their other land for the wharfage, &c., of that coal on its transportation thither by other means. No one then dreamed that the Mount Savage Company's road could or would ever be extended over the Frostburg mountain to Westernport, and bring the coal from the latter region to Cumberland. The Mount Savage Company at the date of the contract had no legal power to extend its road, and both parties to the contract deemed it a physical impossibility to cross the Frostburg mountain with the road. Hence, the contract only provides for Braddock's and Jennings' run coal. Now all the coal going to Walsh & McKaig's wharf is from the Westernport or George's creek region. It is all outside of the contract. But even if the contract was general in its terms and did not expressly exclude George's creek coal, it must be construed by the subject-matter and condition of the parties when it was made. The light of future days cannot be reflected upon it. It must be limited by the state of things existing at its date and by the capacity of the corporation at that time. This rule is supported by reason and authority. 1 *Wallace*, 133, *and cases cited;* 5 *Wallace*, 689; *Brewster vs. Kitchen*, 1 *Ld. Raym.*, 318; *Penn., Del. and Md. Steam Nav. Co. vs. Dandridge*, 8 *G. & J.*, 247; 1 *Md. Ch.*, 543; 1 *Gill*, 222; *Law Rep.*, 5 *Ch. Appeals*, 525; 4 *De Gex & Jones*, 362; 1 *Kay*, 274; *Law Reps.*, 2 *Eq. R.*, 525-527; *L. R.*, 4 *T. B.*, 180, 186; *Munt vs. The Shrewsbury & Chester R. Co.*, 13 *Beav.*, 1.

If a change of circumstances occurring after the date of a contract renders it inequitable to decree specific performance, how much more inequitable is it to apply a contract to a state of facts that did not come into existence for many years after its date, and was not then deemed possible to occur, and to enforce it according to this elastic construction against those who were not parties to it, and against interests that have since grown up from developments of trade, channels of transportation and legislative grants of power not then contem-

plated. *Duke of Bedford vs. Trustees of British Museum,* 2 *Myl. & K.,* 552.

But if the contract covered all the ground that is claimed for it, and was made by the present owner of the road, the C. & P. R. R. Co., it ought not to be enforced, for it is void as being against the policy of the State, and affecting expensive public works and public interests, interfering with the course of trade by forcing it into inconvenient channels and preventing it from seeking newer and better devised ones, and depriving the coal trade on the canal, of the benefit of the great principle of competition—in all which the common weal, the inspiration and life of all human law, is deeply concerned. *Raphael vs. Thames·Valley R. Co., Law Reps.,* 1866, 2 *Eq. Cas.,* 37; *Att'y General vs. E. H. & S. Railway Co., Law Reps.,* 1868, 6 *vol.,* 106; *Windham Cotton Manuf. Co. vs. H., Prov. & Fishk. R. R.,* 23 *Conn.,* 373; *Hooker vs. Woodward,* 4 *Denio,* 349; *Stanton vs. Allen,* 5 *Denio,* 434; *Doolin vs. Ward,* 6 *Johns. Rep.,* 194; *Crouch vs. London & N. W. R. R. Co.,* 14 *C. B.,* 258; 4 *De Gex, M. & G.,* 115, 132, 136; 4 *De Gex & Jones,* 389.

The Cumberland and Pennsylvania Railroad is a public highway, and so was the Mount Savage Company as regards its road; and every railroad company is a trustee of the powers and franchises granted to it, for the benefit of the public, and cannot make a contract to associate others with its directors in managing its road, or shaping its policy, or limiting the exercise of its franchises, where the public is concerned. 1 *Redfield on Railways,* 54, 193–201, 230; *Hartford & New Haven R. R. Co. vs. N. Y. & N. H. R. Co.,* 3 *Robertson, N. Y. Rep.,* 411; *Great Northern Railway Co. vs. The Eastern Railway Co.,* 9 *Hare,* 306; *Same vs. Same,* 11 *Com. Bench,* 775; *Colman vs. The Great Eastern Railroad Co.,* 10 *Beav.,* 1; *Bernard vs. Rufford,* 1 *Sim. N. S.,* 556; 12 *Beav.,* 339; *Ohio & Mississippi R. R. Co. vs. Indianapolis & Cincinnati R. R. Co.,* 5 *Am. L. Reg. N. S.,* 735; *McGregor vs. Dover & Del. R.,* 14 *Barb.,* 471; *Shrewsbury & Birming-*

*ham R. Co. vs. London & N. W. Co.*, 16 *Beav.*, 441, and in 3 *Mann. & G.*, 70, and on appeal in 4 *De Gex, McN. & G.*, 115.

A railroad company is obliged to make its road according to its contract with the public, and to use it for the public when made, and cannot change it without legislative authority.

The contract here is to abandon its own road, and use a piece of road of the Cumberland Coal and Iron Company in its stead. *Rex vs. The Severn & Wye R. R. Co.*, 2 *B. & Ald.*, 681; *People vs. Albany & Vermont R. R.*, 24 *New York*, 261; *Balt. & Susq. R. R. Co. vs. Tilghman, et al.*, 2 *Gill*, 20; *Rex vs. Inhabitants of Cumberworth*, 3 *B. & Adol.*, 108; *Blakemore vs. Elamorganshire Canal Company*, 1 *M. & Keene*, 162; *Lee vs. Milner*, 2 *Mee. & W.*, 824; *Same Case*, 2 *Y. & Col.*, 616; *Queen vs. The Eastern Counties' Railway Co.*, 1 *Eng. R. & C. Cas.*, 375; *Queen vs. Lancashire & Yorkshire R. R. Co.*, 1 *El. & B.*, 178; *Cohen vs. Wilkinson*, 1 *Mac. & G.*, 481.

But even if the contract was valid against the Mount Savage Company, it can, upon no sound principle, be enforced against the Cumberland and Pennsylvania Railroad Company. The franchises and public obligations of the latter company cannot be restricted by the contract of another party. The Cumberland and Pennsylvania Railroad Company was chartered by the Act of 1849, ch. 469. The 3d section gave it power to purchase, hold, lease, sell and convey estates real, personal and mixed, so far as necessary for the purposes limited in the Act, and the 12th section enables it to construct a road, and *lateral railroads* in any direction, and the 19th section gave *citizens and corporations of the State the right to connect* with *its main and lateral roads leading from the main route to any part or parts of the State.*

The Act of 1853, ch. 96 (section 2) authorized it to "*purchase*" a road instead of constructing it, and (section 5) "to receive any existing railroad, or any part thereof, in payment of any subscription of stock, &c."

The Act of 1856, ch. 11, authorized it to extend the Mount Savage road which it had *purchased* before that time, from Mount Savage to the George's Creek Coal and Iron Company's road; and the Act of 1860, ch. 78, approved an extension along Neff's run, and authorized an extension of its road or branches to any mines in the valley of George's creek; and the Act of 1864, ch. 53, confirmed its purchase of the George's Creek Coal and Iron Company's road, which completed its road to Piedmont.

It holds, owns and manages its road, and every part of it, as its property, under its own franchises, and subject to the obligations imposed on it as a highway and common carrier.

The contract is personal to the Mount Savage Company. It does not profess to bind "its assigns or successors." It does not even bind the Mount Savage Company not to assign or sell the road or interests acquired under the contract. If the complainants have any remedy, it is at law against the Mount Savage Company.

The contract between the complainants and the Mount Savage Iron Company, gave the former *no estate or interest* in the Mount Savage Company's road. The Cumberland and Pennsylvania Railroad Company is the assignee of the road. But *there is no privity of estate between it and the complainants.* The owner of real property cannot bind it in the hands of his assignee, with a burden in favor of a stranger. Without contract or privity of estate, there can be no burthen imposed. Notice makes no difference. *Webb vs. Russell*, 3 *Term Rep.*, 402; *Collins vs. Plumb*, 16 *Ves., Jr.*, 454; *Plymouth vs. Carver*, 16 *Pick.*, 183; *Taylor vs. Owens*, 2 *Blackf.*, 301, adopted in 10 *C. B.*, 164; *Keppel vs. Bayley*, 2 *Myl. & K.*, 517.

ALVEY, J., delivered the opinion of the Court.

The object of the bill in this case is to enforce specific execution of certain covenants entered into by the Mount Savage Iron Company of Allegany county, with some of the com-

plainants and those who are represented by the others of them, dated the 8th of September, 1849, and to obtain an injunction to restrain said company and the Cumberland and Pennsylvania Railroad Company, from the further alleged violation of such covenants. The Mount Savage Iron Company and the Pennsylvania Railroad Company are the only defendants to the bill; and the latter company having answered, the injunction was refused, and it is from the order refusing the injunction that the present appeal is taken.

The answer of the one defendant, under oath, having been put in before the application for the injunction was acted on, it must appear either that merits are confessed, or that some substantial and material averments of the bill are left undenied, to entitle the complainants to the injunction as against the defendant answering. 3 *Danl. Ch. Prac.,* 1883; *Magnay vs. Mines Royal Co.,* 3 *Drew.,* 130. Where the injunction has been issued upon the sworn averments of the bill alone, it is the universal practice to dissolve it upon the coming in of the answer, if all the circumstances upon which the equity of the bill is founded be denied. And it is the equally well settled practice to refuse the injunction where the application is made after the coming in of the answer denying the equity of the bill. *Ad. Doct. Eq.,* 356, and authorities collected in note.

As the case is disclosed upon bill and answer, we think there is sufficient ground for the refusal of the injunction, apart from all other questions, in the want of proper parties. The Chesapeake and Ohio Canal Company, and Walsh and McKaig, the owners of the new wharf on the canal basin, are shown to have such an interest in the subject-matter of the litigation, as to require that they should have been made parties defendants. No such relief as that prayed for by the bill could be given without affecting the interest of those parties, and the plainest principles of justice require that their interest should not be adversely affected in their absence, and without an opportunity to be heard. We shall not, however, dispose of the case as now presented upon this ground alone, but shall

examine and decide such of the more prominent questions involved as are supposed to be material to the relief prayed by the complainants.

The Mount Savage Iron Company was originally incorporated, by the Act of 1846, ch. 297, as the Lulworth Iron Company, and by the subsequent Act of 1847, ch. 57, its name was changed to that of the Mount Savage Iron Company. This corporation was invested with all the powers, privileges and rights, proper and necessary for carrying on the manufacture of iron, and of articles of which iron is a component part, and for opening, working, transporting to market and vending the produce of its lands, mines and manufactories, and also for the purchasing and holding all such property, real, personal or mixed, as it might require for the purposes specified; and with full power and authority " to make and enter into all manner of contracts in relation to the business and property aforesaid." And by the 6th section of the act of incorporation, " for the purpose of enabling said corporation to transport the produce of its mines and manufactories to market and elsewhere, in the cheapest and most expeditious manner," it was invested with all necessary powers and privileges for " locating, establishing and constructing a railroad or railroads, with the necessary appurtenances, beginning the same at or near the mines or manufactories of the said corporation, and running to a convenient point or points at or near the town of Cumberland, or to such other point or points as may best suit the convenience and interest of said corporation." And, by *proviso* to the same section, full right and privilege is reserved to the citizens of the State, or to any company incorporated by the State, to connect with such railroad or railroads, upon certain conditions; and the corporation is required to transport on its railroad all persons and property, at the same rates of toll and prices of transportation as the Baltimore and Ohio Railroad Company are allowed to charge and receive. Power is also reserved to the legislature to regulate, modify or change the

control, use and estate of the railroad authorized to be con-
structed, in such manner as it should deem equitable towards
the corporation, and necessary to the accommodation of the
public.

This company, with these corporate powers and franchises,
had, prior to September, 1849, acquired and held large bodies
of coal and other mineral lands in the valley of Jennings' run,
in Allegany county, and had erected and in operation thereon
large rolling-mills and other works for the manufacture of
iron, and had constructed or purchased, and was operating a
line of railroad, which extended from their works at Mount
Savage to the depot of the Baltimore and Ohio Railroad Com-
pany at Cumberland, which was, at that time, the only ter-
minus of such road at the Cumberland end thereof; and over
this road the company was transporting the products of its
own works and mines, and freight for other persons. Up to
this time the Chesapeake and Ohio canal had not been finished
to Cumberland, but was nearly approaching completion to
that point. And in view of such completion, the Mount Sav-
age Iron Company, on the 8th of September, 1849, entered
into the agreement with the complainants for the erection of
wharves, and the right of way for railroad tracks thereto, on
and over the lands of the latter, bordering on the river Poto-
mac, and in near proximity to the canal, for the purpose of
making convenient communication with canal transportation.

A wharf was erected, the railroad track or tracks laid, and
the other improvements, contemplated by the agreement, were
placed upon the land of the complainants by the Mount Sav-
age Iron Company, and that company entered upon the use
and enjoyment thereof at once, and continued to use and enjoy
the same, in the mode and manner as provided for in the
agreement, until the year 1854, when it assigned all its inter-
est and estate in the wharf, and other improvements, placed
upon the land of the complainants, together with all right it
possessed under the agreement of whatever kind or nature, to
the Cumberland and Pennsylvania Railroad Company; and

since which time the latter company has been in the use and enjoyment of the wharf and other improvements, in the same manner as formerly used and enjoyed by the Mount Savage Iron Company. The agreement of the 8th of September, 1849, contains many clauses and stipulations, but there are only two which are immediately involved in this case. By the first of these, it is expressly stipulated that certain other described property belonging to the complainants, and binding on the river Potomac, " shall not be used by them, or by any other person or company, in a manner or for a purpose to compete with the Mount Savage Iron Company, in the transportation of coal from the regions of Braddock's and Jennings' run ; and in opposition to, or in competition with, or diminution of, the value of the wharfage and improvements herein contemplated, so far as the same depend on, or are connected with said transportation of coal from said regions." The agreement then proceeds to declare that " this stipulation is in no way to limit or affect the right of said parties, of the first part (the complainants) to use, sell or convey said other property for wharves, warehouses, coal yards, or other purposes connected with the coal trade, from the Westernport region, and other trade on said canal and river, and the Baltimore and Ohio Railroad, west of Cumberland, and not from Braddock's or Jennings' run region. The object of the restriction above stated being merely to prevent rivalry and competition, and thereby diminished profits from the transportation and wharfage of the coal from said Braddock's and Jennings' run region." The next stipulation involved, and which is the last in the agreement, is that upon which the complainants mostly rely, and that is, that the Mount Savage Iron Company " further agrees and binds itself to make the terminus of its road on said piece or parcel of land, its only terminus on the Chesapeake and Ohio canal, or its basin, and not to extend the present terminus of its road at the present depot of the Baltimore and Ohio Railroad Company, any further than it is now."

And the grievance now complained of, as stated in the bill, and which is the only ground for the relief prayed, is, that the Mount Savage Iron Company and the Cumberland and Pennsylvania Railroad Company, or one of them in concert with the other, for some weeks prior to the filing of the bill in this case, "have been engaged in carrying coal over the line of the Mount Savage Iron Company, as it existed at the date of the agreement, to the wharf, on the line of a basin, constructed by McKaig and Walsh, and forming a basin of the Chesapeake and Ohio canal, and there delivering the same into canal boats for transportation over the canal; the said companies or company using, for the purpose of said carriage, a section of the track of the railroad of the Baltimore and Ohio Railroad Company, connecting with the terminus of the railroad of the Mount Savage Iron Company at the depot of the said Baltimore and Ohio Railroad Company, at Cumberland, as it existed at the date of said agreement, and with the railroad tracks on the wharf of the said McKaig and Walsh; by which means large quantities of coal which would otherwise be carried over the line of said road, and be delivered at the wharves constructed by the Mount Savage Iron Company, on the aforesaid parcel of land, owned as aforesaid by your orators, are diverted from the said line of railroad and wharves, and thus the profits which the said parties to the said agreement of the first part anticipated, and which were intended to be assured to them by the execution of the agreement, have been greatly lessened." The bill further charges that the conduct of the companies, or such one of them as may be actually using and operating the railroad of the Mount Savage Iron Company, is in effect the making of another terminus of such road on the Chesapeake and Ohio canal, and its basin, and is an extension of that road beyond its terminus at the depot of the Baltimore and Ohio Railroad Company, as it existed at the date of the agreement, and is, therefore, a breach of the covenant made by the Mount Savage Iron Company.

The prayer of the bill is, among other things, that an injunction may issue, "to prevent the defendants, and each of them, from carrying and delivering coal which shall or may be carried over the railroad owned by the Mount Savage Iron Company, as it existed on the 8th of September, 1849, *or any part thereof*, to any point beyond the terminus of the said railroad in the depot of the Baltimore and Ohio Railroad Company, as it existed on the day aforesaid, or in any wise aiding or assisting by the use of their motive power or rolling stock, or otherwise, in the carrying and delivery of such coal beyond the said terminus."

Now, treating the case as between the complainants and the Mount Savage Iron Company, upon the undisputed facts as disclosed by the bill and answer, have the former a right to the relief sought as against the latter, under the contract? And to determine this question we must first ascertain to what subject-matter the contract relates, and what conduct on the part of the Mount Savage Iron Company was intended to be prohibited by it.

At the date of the contract the railroad of the Mount Savage Iron Company extended no farther westward than the location of its main works at Mount Savage; nor had that company any power to construct a railroad beyond that point. By its charter the railroad was to begin at or near its mines or factories, and run to some convenient point or points at or near the town of Cumberland.   It was not authorized to extend the road into the George's creek valley, and its operation was confined to the transportation of the coal and other mineral products of the Braddock's and Jennings' run regions. It is to those regions that the contract refers, as the locations from which the coal was to be transported to the wharves erected on the land of the complainants.   And understanding such to be the field of the road's operation, while providing against competition in the trade from those regions, the parties expressly declare that no stipulation contained in the contract should in any way limit or affect the right of the

complainants to use, sell or convey their adjoining property, fronting on the river, for wharfs, warehouses, coal yards, or other purposes connected with the coal trade from the Westernport region, and not from the Braddock's or Jennings' run region. Thus plainly showing that it was only the trade from this latter region that was in the contemplation of the parties at the time, and so far as the trade from other regions or sections was concerned, and particularly the Westernport region, the parties were left entirely unrestrained by the contract. That being so, if it be true, as stated in the answer, that all the coal that has been transported over the road that formerly belonged to the Mount Savage Iron Company at the date of the contract, and taken to the wharf of Walsh and McKaig, on the canal basin, has been brought from the George's creek valley, or the Westernport region, it is difficult to perceive upon what principle the complainants can suppose themselves aggrieved. The principle of construction is well settled, that to fairly understand the meaning and intent of the contracting parties, reference must be had to the condition of things existing at the date of the contract. Courts should read the contract as the parties understood it, and, in order to do that, they should avail themselves of the light of all the surrounding circumstances. And applying this rule of interpretation to the contract before us, even if its terms and obvious intent were less plain than they are, we could not fail to perceive that the contract was never intended to apply to the coal trade that might thereafter be opened from the Westernport or George's creek region. And although it is not pretended that the contract contains any express affirmative stipulation on the part of the Mount Savage Iron Company, that all the coal that might be transported by it, should be taken to the wharves on the complainants' land, it is, nevertheless, insisted that the covenant by the corporation, to make the terminus of its road on the land of the complainants its only terminus on the Chesapeake and Ohio canal, and not to extend its then terminus at the depot of the Baltimore and

Ohio Railroad Company, towards the canal, plainly implies a covenant to take to the complainants' wharf *all* the coal transported by the railroad of the Mount Savage Iron Company for transshipment on the canal; and that too without reference to the location or region from which it may be transported. In this general proposition, however, to the extent contended for, we do not agree. This latter covenant must be construed with reference to the subject-matter in the contemplation of the parties at the time, and must not be given a scope and operation which was never designed it should have. As we have said, the contract only contemplated and was intended to apply to the trade from the regions in which the road was operating at the time. The largest application, therefore, that could be given to this restrictive covenant, is to prohibit the establishment of any depot or terminus of the road other than those mentioned, to which the coal and other freight from the regions of Braddock's and Jennings' run could be taken. The corporation had power under its charter to make the eastern terminus of its road at any " convenient point or points at or near Cumberland, or at such other point or points as should best suit the convenience and interest of the said corporation;" and, according to our construction of the contract, it only restricted itself in the exercise of the ·power of selecting the points of termination as to the trade from the particular sections mentioned. If, by subsequent legislation, the corporation had been empowered to extend its road into other sections, or to become general carriers without reference to any particular private object of incorporation, we do not for a moment suppose that it would be so far bound by this covenant as to be prevented from adopting such other depot or terminus of its road, as would better suit its own and the public's interest and convenience. As to the produce of its own mines and manufactories, it is clear, it was perfectly competent to the corporation to bind itself to ship them from any particular wharf; but as to such freight as the railroad was bound to carry for others than the corporation itself, and as

common carriers, it is very questionable indeed whether such a covenant as that under consideration, even in its restricted form, would be enforced by a Court of Equity. Railroad companies accept and hold their privileges and franchises with reference to the public interest as well as their own ; and, indeed, they are, as was said by a learned English Chancellor, trustees of the public, in an important sense of that term. No contract, therefore, unless plainly authorized by their charter, if it is likely to be detrimental to the interest of the public, can obtain the sanction of a Court of Equity. Monopolies, and compacts for the prevention of competition in trade, can never, as a general thing, be promotive of the public good, and hence they are not favored by Courts of Justice ; and the covenant in question has rather too much of that obnoxious element in it to meet with much favor at the hands of a Court of Equity upon an application for specific execution. It is not deemed necessary, however, to decide this particular question here, as there are other questions involved quite decisive of the case before us.

Seeing, then, upon a fair construction of the agreement, what are the rights of the complainants as.against the Mount Savage Iron Company, what are their rights as against the Cumberland and Pennsylvania Railroad Company, the assignee, and, at this time, the sole and exclusive owner of the road owned and used by the Mount Savage Iron Company at the date of the agreement?

The Cumberland and Pennsylvania Railroad Company was incorporated by the Act of 1849, ch. 469, with authority to construct and operate a separate and independent road from that of the Mount Savage Iron Company; and, unlike the latter company, it is exclusively a railroad company, unconnected with mining or manufacturing operations. It is a general carrier of passengers and freights, and has the usual railroad powers and franchises, and is, of course, subject to the ordinary principles that govern common carriers of its class. One main object of its incorporation and construction

was the facility it might afford to the development of the coal trade of that section of the State, and in which the State itself was, and is still, largely interested. It is now one of the main instrumentalities by which the coal trade on the Chesapeake and Ohio canal is maintained, and its operation, therefore, is alike important to the coal companies and the Chesapeake and Ohio Canal Company. By its original charter, this corporation was authorized to construct a railroad from the town of Cumberland to some suitable point on the dividing line between the States of Maryland and Pennsylvania, with power to make lateral roads in any direction whatsoever. By supplements to its charter, it was authorized to purchase existing railroads, or to take the same in payment of capital stock subscribed; and, under these powers, it constructed, and acquired by purchase, a continuous line from the town of Westernport up the George's creek valley to Frostburg, and from thence to the town of Cumberland. By the Act of 1853, ch. 96, section 5, authorizing the company to accept any existing railroad in payment of stock, any incorporated company then existing in Allegany county, was authorized to subscribe to the capital stock of this company, and in pursuance of this authority, the Mount Savage Iron Company subscribed for stock, and in payment thereof, assigned to the Cumberland and Pennsylvania Railroad Company the line of railroad running from the foot of the Frostburg mountain to the town of Cumberland, and which forms a part of its continuous line from Westernport to Cumberland. The deed of assignment is dated the 2d of January, 1854, and by which, besides the road, all the interest, right and estate of the Mount Savage Iron Company in and to the wharf property, together with all the rights and benefits secured to and held by it under the agreement of the 8th of September, 1849, are assigned to the Cumberland and Pennsylvania Railroad Company. In the use and operation of the road, therefore, the Mount Savage Iron Company has no interest or control whatever, except as stockholder in the Cumberland and Penn-

sylvania Railroad Company. To what burden, then, is this latter company subject, under the agreement of the 8th of September, 1849, by reason of the assignment by the former company?

It is contended by the complainants that the burden and restriction of the covenants, on the part of the Mount Savage Iron Company, attached to the entire road itself, as it existed at the date of the agreement, and that such burden and restriction adhere to and follow the road into the hands of the assignee, its present holder, who is bound to use the road only as the Mount Savage Iron Company could use it, under the agreement, and in no other way. We are not, however, of that opinion.

In *Spencer's Case,* 5 *Coke,* 16, which is the leading case on this subject, the action was covenant by the lessor against the *assignee of the lessee,* on a covenant by the lessee for himself, his executors and administrators, that he, his executors, administrators or assigns would build a new brick wall on the demised premises; and it was for not making the wall that the action was brought. And the Court, among other resolutions, resolved, 1st. That when the covenant extends to a thing in *esse,* parcel of the demise, the thing to be done by force of the covenant is in a manner annexed and appurtenant to the thing demised, and shall run with the land, and shall bind the assignee, although he be not bound by *express words;* as if the lessee covenant to repair the houses, this is parcel of the contract, and extends to the supporting of the thing demised: but, because the covenant in that case was in respect of a thing which was not in *esse* at the time of the demise made, but to be newly built after, and therefore bound only the covenantor, his executors or administrators, *and not the assignee,* the covenant did not, by the law, annex. 2d. But if the lessee had covenanted for himself *and his assigns,* that they would make a new wall upon some part of the thing demised, that forasmuch as it is to be done upon the land demised, that it should bind the assignee; for although

the covenant doth extend to a thing to be newly made, yet it is to be made upon the thing demised, and the assignee is to take the benefit of it, and therefore shall bind the assignee *by express words.* These in short are the first two resolutions in that celebrated case, and the distinction there taken between the cases where the assignee is bound, although not named, and where he can only be bound by the express words of the covenant, has been recognized and acted on in modern cases. *Balley vs. Wells,* 3 *Wils.,* 25, 27; *Vernon vs. Smith,* 5 *B. & Ald.,* 1.

In this case, the covenant does not stipulate for the covenantor and its assigns; and as in *Spencer's Case,* the stipulation for the erection of the wharves and other improvements on the complainant's land, was in reference to things not then in *esse;* nor was the implied covenant to ship coal over the wharves that might be thereafter built, of a nature to attach to the road of the covenantor, in the hands of an assignee; certainly not without express words to that effect, if even then. For suppose, instead of such an assignment as was made, the road, as it existed at the date of the contract, had been assigned to one party, and all the right, title and estate acquired by the Mount Savage Iron Company under the agreement had been assigned to another and a different party, what would have been the predicament of the complainants? They would clearly have no right to enforce the covenant against the assignee of the road, with whom they would have no privity, and whose road would have no connexion whatever with their estate. Nor could they insist upon the execution of such a covenant by the assignee, of the right and interest under the contract, as he would not have the road with which it could be done.

The case having the closest analogy in its facts to the present, is that of *Hemingway vs. Fernandes,* 13 *Sim.,* 228. There A., a land owner, entered into articles of agreement with B., the lessee of a neighboring colliery, by which he agreed to grant to B. a lease of part of the land for the purpose of forming a railway for the conveyance of coal to certain

wharves, and B., for himself *and his assigns,* agreed with A., his heirs and assigns, to convey upon the railway all the coal to be gotten from the colliery, or from any other lands or grounds in the township, and to pay to A., his heirs and assigns, two pence for every ton of coal so conveyed.   B. assigned his interest in the colliery, and in the lands taken under the articles of agreement, for forming the railway, together with the use of the railway, to C.   And it was held, that the agreement to convey all the coal upon the railway ran with the land, and, consequently, that it was binding on C., the assignee; but it was so held upon the express ground that the covenantor had covenanted for himself, *and his assigns in terms;* the Vice-Chancellor saying that it seemed to him that the case did expressly fall within the second resolution in *Spencer's Case.*

But the more controlling authority with us is the case of *Keppel vs. Bailey,* 2 *M. & K.,* 517, a case in which all the previous authorities are elaborately reviewed by Lord Chancellor BROUGHAM.   There, certain parties having formed themselves into a company for the establishment of a railroad called the Trevil, the two Keppels, who held the Beaufort iron works under a long lease, had covenanted with the proprietors of the railroad and their assigns, that they, and their assigns, would procure all the limestone wanted for the iron works from the Trevil quarry, and carry it along the Trevil railroad, paying a certain toll.   The Keppels assigned their lease of the iron works to the defendants, who began to construct a railroad to other lime quarries, situated eastward of the Trevil quarry; and on a bill for an injunction to restrain them from using that or any other new road, it was held that the covenant did not run with the land so as to bind the assignees at law, and that a Court of Equity would not, by holding the conscience of the purchaser to be affected by the notice of the covenant, give such covenant a more extensive operation than the law allowed to it.   And upon the main question, whether the covenant was of a nature to run with the Beaufort iron works, so as to bind the assignee, the

Lord Chancellor said: "Assuming that the Keppels covenanted for their assigns of the Beaufort works, could they, by a covenant with persons who had no relation whatever to those works, except that of having a lime quarry and a railway in the neighborhood, bind all persons who should become owners of those works, either by purchase or descent, at all times, to buy their lime at the quarry, and carry their iron on the railway; or could they do no more, if the covenant should not be kept, than give the covenantees a right of action against themselves, and recourse against their heirs and executors, as far as those received assets? Consider the question first upon principle—there are certain known incidents to property and its enjoyment; among others, certain burdens wherewith it may be affected, or rights which may be created, or enjoyed with it, by parties other than the owner; all which incidents are recognized by the law. But it must not therefore be supposed that incidents of a novel kind can be devised and attached to property, at the fancy or caprice of any owner. It is clearly inconvenient, both to the science of the law and to the public weal, that such a latitude should be given. There can be no harm in allowing men the fullest latitude in binding themselves and their representatives, that is, their assets, real and personal, to answer in damages for breach of their obligations. This tends to no detriment, and is a reasonable liberty to bestow; but great detriment would arise, and much confusion of rights, if parties were allowed to invent new modes of holding and enjoying real property, and to impress upon their lands and tenements a peculiar character, which would follow them into all hands, however remote." His opinion was very decided, that the covenant did not adhere to the Beaufort iron works, and, consequently, the assignee was not bound by it.

But it has been suggested that the authority of this case of *Keppel vs. Bailey*, is questionable, and that it is not consistent with other decided cases. So far, however, from such being the case, we find that it is constantly referred to by approved writers on the subject as a leading case, and its authority has

been most pointedly sanctioned by the recent case of *Ackroyd vs. Smith*, 10 *C. B.*, 164.

We are of opinion, therefore, that the covenant here in question does not run with or adhere to the railroad of the Mount Savage Iron Company, as it existed at the date of the agreement, so as to bind it in the hands of the assignee. The Cumberland and Pennsylvania Railroad Company purchased this road under express authority of the legislature, and it is entitled to hold and use it under the powers and franchises conferred upon that company by its charter, without being in any way fettered by the covenant of the former owner of the road. The complainants may have their right of action against the Mount Savage Iron Company for a breach of covenant, if there has been a breach committed, but they cannot have the covenant specifically executed. It is true, if any attempt were made by the assignee of the Mount Savage Iron Company to use and apply the wharves and other improvements on the land of the complainants, in a manner and to a purpose different from that intended, a Court of Equity would restrain such improper use and appropriation. In such case, the question would be, not whether the covenant ran with the land, but whether the party should be allowed to use and appropriate the land in a manner wholly at variance with the contract entered into by its assignor, and with notice of which it purchased. That is the principle of the case of *Tulk vs. Muxhay*, 2 *Phill.*, 774; but it is not involved in the present application.

We shall, therefore, affirm the order refusing the injunction; but as the bill prays, in the alternative, for the rescission and cancellation of the contract, and the surrender of the property, which raises a question not now proper to be decided, we shall not dismiss the bill, but remand the cause, that further proceedings may be had with a view to the determination of the question as to the alternative relief.

*Order affirmed and*
*cause remanded.*

(Decided 23d June, 1871.)