## MARYLAND AND PENNSYLVANIA R. CO. *vs.* ANNA W. SILVER.

*Railroad Companies—Covenant in Deed to Maintain Station on Land Granted—Rights of Assignee of Grantor— When Station May Be Abandoned.*

When a conveyance of land to a railway company contains a covenant on the part of the company to make and maintain on the land conveyed a passenger and freight station, where all local trains shall. stop when flagged, such covenant does not create an easement appurtenant to the land reserved by the grantor so as to ·pass to an assignee thereof.

A covenant by a railway company to maintain a station on the land granted is not enforceable by the heirs or assigns of the grantor when they are not named in the deed as covenantees, since the covenant, not relating to a thing then in being, does not run with the land, and since it is not within the purview of Code, Art. 21, sec. 70, providing that covenants in deeds shall be deemed to be with the heirs and assigns of the grantee.

The covenant on the part of a railroad company to erect and
miantain a public station at a certain place on its line is
fairly complied with by the erection and maintenance of
such a station for a period of years, and until the exigencies
of business, the convenience of the public and the welfare
of the railroad demand its removal.

*Decided May 20th, 1909.*

Appeal from the Circuit Court for Harford County (VAN
BIBBER, J.).

This action was brought by the appellee, Anna W. Silver,
against the appellant, Maryland and Pennsylvania Railroad
Company to recover damages for the depreciation in value of
certain lands of the appellee, located in Harford County, at
a station on the line of defendant's road about one mile south
of the southern boundary of Pennsylvania, known as Cam-
brai, and also to recover damages for the loss of certain rents
of a warehouse erected thereon close to the right of way of
the appellee.

The material facts of the case so far as important to be
considered are, briefly stated, as follows: On March 21, 1884,
James R. Whiteford, of Harford County, being then seized in
fee of about thirteen acres of land on the Stafford public road
in that county, conveyed by deed of that date a strip thereof,
containing something more than an acre and a half, to the
Maryland Central Railroad Company, its successors and as-
signs, for railroad purposes only. The consideration named
in the deed was the sum of "five dollars and divers other good
causes and considerations, them thereunto moving." In the
premises the grant was absolute for the purposes aforesaid,
but the *habendum* contained, *inter alia,* the following:

"Subject nevertheless to the following conditions and stipu-
lations, namely:

"First—The said Railroad Company shall at once make
and maintain on said land herein conveyed a passenger and
freight station, where all local trains shall stop when flagged

512      MD. AND PA. R. CO. vs. SILVER.

Statement of the Case.                    [110

by those properly in charge thereof, the passenger trains to receive and deliver passengers and the freight trains to receive and deliver freight.

"Fifth—That so long as the said James R. Whiteford and said company can agree the said Whiteford shall perform the duties of station agent, if he desires so to do, at the station herein provided to be maintained on the premises above granted." "And the said party of the second part recognizes the full, free and binding effect of the conditions herein contained upon which the aforegoing grant is made, and agrees to accept said grant of land upon the terms set forth above and to comply with all the conditions and obligations imposed by this deed."

The deed was executed by the grantor and his wife, and also by the grantee.

At the date of the deed there were no improvements on the thirteen acres of land, it being described by one of the witnesses as "an old common."

During the same year, or shortly thereafter, the railroad company constructed a railroad on its newly acquired right of way, and about the same time the grantor erected on his own land contiguous to the strip conveyed to the railroad company a large warehouse. Mr. Whiteford also built a dwelling house near the station for the use of himself and family, also a tenant house, stable, wagon house, cornhouse and other necessary outbuildings; he also fenced the property and otherwise improved it.

Shortly thereafter the railroad company built a station on its right of way and Mr. Whiteford was put in charge as agent for the company.

The new station was called Cambria, and Mr. Whiteford continued to serve as resident agent there until 1893, when the position was given to his son William, who served until December, 1894.

Several other persons subsequently served as agents at Cambria for different periods of time until March 1, 1901, when the resident agent was removed and the business of the

station thereafter handled by the agent at Cardiff, a station on the defendant's road about one mile north of Cambria, near the Pennsylvania line.

The Maryland Central Railroad Company was a Maryland corporation, originally incorporated by Chapter 121 of the Acts of 1867, and was authorized to construct, equip and operate a railroad within the State of Maryland, to run from Baltimore northerly through Baltimore and Harford Counties to the southern boundary of Pennsylvania.

As originally constructed it was a narrow-gauge road and for several years after the making of the deed first above mentioned, of date March 21, 1884, its most northerly station was Cambria. Subsequently, in 1894, the line was extended northward about a mile to within a few yards of the State line, and the above-mentioned station of Cardiff established there with a resident agent in charge.

At the same time the York Southern Railroad, a Pennsylvania corporation, had its southern terminus at South Delta, a small place a few yards north of the State line, in York County, Pennsylvania.

About January 1, 1901, these two intra-State railroads were consolidated under the name of the Maryland and Pennsylvania Railroad Company, and it is conceded that the new corporation became entitled to "all the franchises, rights, privileges and properties of the Maryland Central Company, and subject to all its duties, obligations and liabilities."

After the consolidation of the two roads as above mentioned the Maryland end was broad-gauged to correspond with the Pennsylvania road, and there were then four stations on the line within a distance of two miles of Cambria, to wit, Cambria and Cardiff, in Harford County, Maryland, and South Delta and North Delta in York County, Pennsylvania, each station having a resident agent.

The business of the road did not justify so many agency stations so near together, and therefore on March 1st, 1901, a central station was established and the agents at all the other stations mentioned were removed, including the agent at Cam-

bria, though the station itself was maintained and local trains stopped there to receive and deliver passengers and freight as before.

·From 1884 to 1896 Mr. James R. Whiteford carried on a warehouse business at Cambria in the warehouse built by him near the railroad at that place, his business consisting of the purchase and sale of fertilizer, hay, grain, coal and perhaps of some lumber. On March 11th, 1897, James R. Whiteford and wife conveyed by deed the twelve acres of land remaining to him of the original thirteen, adjoining the railroad right of way at Cambria, to his two sons, William and Marshall, and on March 13th, 1899, these two brothers conveyed the property to their sister, Anna W. Silver, the appellee in this case.

·In 1896 James R. Whiteford moved away from Cambria, and the warehouse was rented to a man named Robinson. William Whiteford conducted the business there for Robinson for about two years, but in 1898 or 1899 the business was abandoned and the warehouse used only for the storage of goods and chattels of different kinds.

There is evidence in the record adduced on the part of the plaintiff to the effect that the property of the plaintiff has greatly depreciated in value by reason of the removal of the resident agent at Cambria, and also that since such removal the warehouse cannot be rented, though with a resident agent there, Cambria would be a good business point, and the warehouse could easily be rented for $40 or $50 per month.

The defendant, on the other hand, offered evidence tending to show that as a matter of fact the warehouse business at Cambria had never prospered; that at least two years before the resident agent was removed the business at the warehouse had been abandoned, and even the railroad's business at that place had dwindled to such small proportions that the cost of maintaining a resident agent there was equal to thirty per cent. of the total receipts at that station, whereas five per cent. was the usual allowance.

The trial Court refused the plaintiff's claim for damages as to the alleged depreciation in value of the land, and restrict-

ed recovery to the loss of rents for the warehouse to the time of the trial caused by the failure of the defendant to keep a resident agent at Cambria Station. The jury found for the plaintiff in the sum of $2,000, upon which judgment was entered and the defendant has brought this appeal.

The cause was argued before Boyd, C. J., Briscoe, Schmucker, Thomas, Worthington and Henry, JJ.

*Stevenson A. Williams* and *Fred. R. Williams,* for the appellant.

*John S. Young* and *J. J. Archer,* for the appellee.

Worthington, J., delivered the opinion of the Court, after making the forgoing statement of facts.

The theory of the plaintiff's case is, that the first stipulation in the habendum of the deed of date March 21, 1884, being the one relied on by the plaintiff to sustain the action, created an easement in the land conveyed for the benefit of the land retained by the grantor; or at least that it is a covenant that runs with such land in favor of the plaintiff as assignee of the original grantor.

We cannot agree, however, that a fair interpretation of the language of the stipulation in the deed warrants the inference that it was the intention of the parties to create or reserve a right in the nature of an easement in the property granted for the especial benefit of the land retained.

The station covenanted to be erected and maintained on the railroad's right of way, was manifestly intended as a public station for the use of the public generally. There are no words in the deed anywhere to show that it was to be made and maintained for the especial benefit of the grantor, or of the land retained by him.

There was of course incidental benefit to the grantor, and also to his remaining land, but a similar benefit, less only in degree, was also conferred upon other adjoining property.

A private easement implies, as an essential quality thereof, two distinct tenements; namely, the dominant, to which the right belongs, and the servient, upon which the obligation rests. *Wolfe v. Frost,* 4 Sand. Ch. 89.

Here the public were to have the use and benefit of the station and it could not with propriety be said that there was any dominant estate to which such right belonged.

The right created by the stipulation in the deed cannot therefore be deemed an easement appurtenant to the land reserved so as to pass as part thereof to the assignee of the grantor, but rather it should be treated as a covenant by the railroad company to do and perform something on the granted land that while incidentally intended to benefit the grantor, was also manifestly intended for the use and benefit of the community generally.

Assuming for the present,therefore, without deciding, that the original grantor bore such contractual relation to the rail road company as to entitle him, now, were he a party to these proceedings, to maintain an action on the covenant, does the covenant so run with the land retained by the grantor as to enure to the benefit of the plaintiff in this case?

A covenant in a deed, whether to be performed on or off the land, must in order to run with the land, touch and concern the land so that the thing required to be done will tend to enhance its value or render it more convenient or beneficial to the owner, and if the covenant extends to something not then *in esse,* the covenant must be to one, "his heirs and assigns" by express words, else the assignee shall take no benefit of it. *Spencer's Case,* 1 Smith's Leading Cases (9th ed.), page 174; *Whalen's Case,* 108 Md. 11.

In the case at bar the covenant was made with reference to something not then *in esse,* and there are no words of limitation to the heirs and assigns of the grantor. It is contended, however, that since the Act of 1856, Ch. 154 (Code, Art. 21, sec. 11), as words of inheritance are unnecessary to create a fee, the covenant in this case being in the nature of a recon-

veyance of an interest in the lands conveyed, such words are unnecessary here.

In the case of *Ross* v. *McGee,* 98 Md. 389, this Court held that the Act in question "was never intended to apply to reservations of privileges and the granting of an easement," such as was claimed in that case. There the reservation was of the right to use the water from a spring located on the land conveyed, and the Court held that the right did not enure to the benefit of an assignee of the grantor.

Here the right was not created by way of a reservation, but by way of a covenant, which though it may be said, in a sense, to touch and concern the land retained by the grantor, yet extended to something not in existence at the date of the deed and the words heirs and assigns are not expressed. Under the circumstances we do not think the Act of 1856 does away with the necessity for the use of these words in order to pass the right created by the covenant in question to an assignee of the grantor.

Neither do we think the Act of 1864, Ch. 252 (Code, Art. 21, sec. 70), applicable to this case. Statutes in derogation of the common law are to be strictly construed and the covenant now under consideration appears to be beyond the immediate scope and object of that enactment.

2. But aside from the aforegoing considerations it has been held in a number of well reasoned cases that the covenant on the part of a railroad company to erect and maintain a public station at a certain place on its line, even if originally valid, is fairly complied with by the erection and maintenance of such a station for a period of years, and until the exigencies of business, the convenience of the public and the welfare of the railroad demand its removal. *Texas* v. *Scott,* 37 L. R. A. 94; 77 Fed. 726; *Mobile* v. *People,* 132 Ill. 559; *Camp's Case,* 15 L. R. A. (N. S.) 594; 130 Geo. 1; *Jeffersonville* v. *Barbour,* 89 Ind. 375.

The reason for the rule being that as the number and location of a railroad's depots and public stations must depend upon the conditions of population and amount of business at

the different places along its line, and as changes take place in these conditions from time to time, the determination of such questions is appropriately committed to the directors or managers of the railroad company.

This does not mean, of course, that a railroad company may wilfully and arbitrarily refuse to establish or maintain a public station at any certain place on its line, when it has legally obligated itself so to do.

And while the Courts do not usually specifically enforce such contracts, damages are frequently recoverable for their wilful breach. *Chicago and E. I. R. Co.* v. *People,* 222 Ill. 403; *Marsh* v. *Fairburg R. Co.,* 64 Ill. 414; *Wilson* v. *Winchester R. Co.,* 41 C. C. A. 215; *Rockford, etc.,* v. *Beckemeier,* 72 Ill. 267; *Elliott on Railroads,* secs. 386 and 387; *People* v. *Board of Ry. Comms.,* 158 N. Y. 421.

In some jurisdictions contracts for the location of public stations are held to be absolutely illegal. *Burney* v. *Ludeling,* 47 La. Ann. 73; *Florida Cent.* v. *State,* 31 Fla. 482 (20 L. R. A. 419); *Greenhood on Public Policy,* sec. 149, pages 316-321; while in others, as we have just seen, the contract is held to have been performed after a reasonable time, when changed conditions warrant a removal or relocation.

What we have said renders it unnecessary to consider the several prayers of the respective parties seriatim. The plaintiff's first prayer we consider objectionable, because it fails to correctly instruct the jury as to the rights of the plaintiff as assignee of James R. Whiteford, but rather submits to the jury to find what those rights are. The plaintiff's rights depend upon the proper construction of the deed of date March 21, 1884, and of the subsequent deeds by virtue of which she obtained title to the property.

The proper interpretation of any written instrument is a question of law for the Court, and it was error to have submitted such question to the jury. *Whiteford* v. *Munroe,* 17 Md. 135.

As the evidence in the case disclosed the fact that the resident agent at Cambria had been kept there a period of seven-

teen years, and for several years of that period at a loss to the company, and also as it appears that the warehouse, for two years or more before the removal of the agent, had been used merely for storage purposes, we think the railroad was justified in no longer keeping an agent at that place, and that the defendant's ninth prayer should have been granted.

We think this case is clearly distinguishable from that of *R. R. Co.* v. *Compton,* 2 Gill, 20.

In that case the benefits to the landowner were deemed by the jury of condemnation, equivalent to the value of the land, and only one cent damages were awarded.

Subsequently the railroad was removed to a distance that no longer rendered it a benefit to Compton's land, and it was held that inasmuch as the land had been ruined for agricultural purposes by deep cuts and embankments, that the owners could recover its value from the railroad company.

This is not a suit to recover the value of the land, but, as presented by this appeal, for alleged incidental damages, based upon a hypothetical loss of rents, and we do not think it can be maintained.

As we do not think the plaintiff entitled to recover, we will reverse the judgment without awarding a new trial.

*Judgment reversed with costs.*