516 A.2d 1028

**George R. GALLAGHER, et ux.**

v.

**F. Meade BELL, et al.**

**No. 193, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Nov. 7, 1986.

Certiorari Denied Jan. 27, 1987.

200

George R. Gallagher, Dickerson (James A. Sullivan, Rockville, on the brief), for appellants.

Charles Norman Shaffer (Shaffer & Davis, Chtd., on the brief), Rockville, for appellees.

Argued before WILNER, BLOOM and ROSALYN B. BELL, JJ.

WILNER, Judge.

In 1960, appellants George and Judith Gallagher bought a charming Eighteenth Century tenant house situated on about a half acre of land in Montgomery County. It was, unfortunately, in the middle of a larger tract owned by appellees that was intended for eventual development. In 1961, under circumstances we shall shortly describe, the Gallaghers entered into an agreement with appellees in which the Gallaghers promised to dedicate some of their land for public streets to be built adjacent to their property and to pay a pro rata share of the cost of installing those streets and certain utilities. The Gallaghers conveyed their property in 1980, before any streets or utilities were installed. The principal issue before us is whether the Gallaghers have any continuing liability on their promise to pay; that, in turn, depends on whether the promise is to be regarded

as a covenant "running with the land" or as a personal promise on their part.

All the land involved in this case—something more than 34½ acres—was once owned by the Sisters of Mercy of the Union in the United States of America, Incorporated (the Sisters). The land lies generally to the north and east of Bradley Boulevard and had access to that road by means of Kendale Road, an 18–foot private road that ran just over a mile from Bradley Boulevard to the Sisters' "Villa Marie" Mansion House. Kendale Road also served the old tenant house on the land.

In 1959, the Sisters sold the Mansion House and some immediately surrounding acreage to the Franciscans, retaining the balance of the tract. In order that the Franciscans not be landlocked, the Sisters included an easement in the deed, giving the Franciscans the right to use Kendale Road from the Mansion House to Bradley Boulevard. Later in 1959, the Sisters sold the remainder of the tract, save only the half-acre parcel on which the tenant house was situate, to appellees F. Meade Bell and David P. Bell. It was understood that the Bells, who are developers, were buying the 34½–acre tract in order to subdivide and develop it, for the contract mentions "the proposed subdivision." The last clause of the contract dealt with the excepted parcel; it provided: "The existing house and lot in Section 4 shall be excluded from this contract. Subsequent purchaser of said lot and house shall agree to dedicate half of street bounding said lot and share pro-rata cost of installing street and utilities by this purchaser of Section 4." [1]

In April, 1960, the Gallaghers purchased the half-acre parcel and tenant house from the Sisters. In the contract, Mr. Gallagher agreed "to dedicate half of streets bounding said lot and shall share pro-rata cost of installing street and utilities by F.M. and D.P. Bell." [2] It was further agreed

---

1. The tract purchased by the Bells was designated as Section 4 on the 1959 plat prepared by S.K. Doubroff.

2. It does not appear that Mrs. Gallagher signed the contract.

that the contract would be binding on the principals and their respective heirs, successors, and assigns and that its provisions would "survive the execution and delivery of the deed ... and shall not be merged therein."

The purchase price of $15,600 was to be paid in cash. It appears, however, that the Gallaghers, who took title jointly, needed financing, and the Sisters permitted them to settle without full payment. The deed, dated October 4, 1960, made no mention of the contractual covenant to dedicate half of the abutting streets or to share in the cost of installing the streets and utilities. At some point, the Gallaghers arranged for mortgage financing in order to discharge their obligation to the Sisters, but, after reviewing the various documents, the prospective lender raised a concern that, in the absence of some right-of-way agreement permitting the Gallaghers to use Kendale Road, they might be landlocked. Mr. Gallagher, a lawyer and later a judge in the District of Columbia, believed that he had some sort of easement by necessity and that a permissive easement or right-of-way was unnecessary, but the lender apparently had sufficient doubt about the matter to insist on obtaining a specific grant before proceeding to make the loan.

So it was that, on June 16, 1961, the Gallaghers entered into an agreement with the Bells under which:

(1) the Bells granted to the Gallaghers

"a temporary right of way over that portion of the existing private road now known as Kentsdale Drive [3] leading to Bradley Boulevard from [the Gallaghers' property] which crosses the [Bells' property] until such time as said portion of said private road is supplanted by a dedicated and paved road giving access from the [Gallaghers' property] to Aldershot Drive as now dedicated, at which time the right to the use of said portion

---

**3.** It is not clear from the record whether "Kentsdale Drive" was simply a new name for Kendale Road or was a different private road.

of said private road by [the Gallaghers] shall terminate" and

(2) "[A]s part of the consideration for this agreement the [Gallaghers] do hereby covenant and agree for themselves, their heirs and assigns, that they will dedicate one-half of the streets bounding on their said property and shall share pro-rata the cost of the installation of said streets and the utilities by [the Bells]."

The circumstances under which this agreement was negotiated and signed were in some dispute. There was some evidence that at least one of the Bells refused to grant the right-of-way without the concomitant promise to dedicate and pay and that, given the position taken by their prospective lender, the Gallaghers really had no choice but to sign the agreement. The agreement was signed, however, and was recorded by the Bells among the county land records.

Years passed without further contact between the parties. The Bells were small developers, building only a few homes a year, and, when they turned to develop the tract purchased from the Sisters, they started in the area of Bradley Boulevard. Their progression toward the area of the Gallagher property was interrupted for several years by a State sewer connection moratorium decreed in the early 1970's. At some point in late December, 1978, or early January, 1979, David Bell took to the Gallaghers a subdivision plat showing two proposed roads abutting their property—White Post Court on the north and Kendale Road on the west. The plat contained on it an "Owners Dedication" dedicating the necessary land for the roads shown on the plat. As with the 1961 agreement, there is some dispute as to how and when Mr. Bell presented the plat, but it is clear that the Gallaghers wrote on it "no objection," signed it, and returned it to Mr. Bell. They almost immediately had second thoughts, however, and, on January 5, 1979, wrote to the Bells withdrawing their "no objection" and signatures. The purported withdrawal notwithstanding, the plat was recorded, thereby carrying out one of the two covenants undertaken by the Gallaghers in their 1961 agree-

ment and permitting the Bells to proceed with their development plans.

Ten months later, in October, 1979, the Gallaghers sold their property to Deborah Camalier. Ms. Camalier, who became aware of the recorded 1961 agreement between the Gallaghers and the Bells, apparently insisted on an indemnity from the Gallaghers. The Gallaghers thereupon signed and delivered to Ms. Camalier this agreement:

> "Consonant with the contract of sale of the residence at 9703 Kentsdale Drive, Potomac, Maryland, entered into between George R. and Judith K. Gallagher (sellers) and Deborah Camalier (buyer), on October 22, 1979, sellers agree to indemnify and to save the purchaser harmless against any agreement on file in the courthouse in regard to the expense of the road construction along the property lines of the above residence."

The Bells finally got started on the roads in the area of the Gallagher/Camalier property in 1983. In July of that year, they made demand on Ms. Camalier for some $18,000. When Ms. Camalier refused payment, relying on her indemnity agreement, the Bells made demand on the Gallaghers, and, when they rejected the demand, the Bells filed this lawsuit. It is undisputed that, at the time the suit was filed, the streets for which contribution was sought had not yet been completed.

The Gallaghers defended the action on a number of bases, including that the covenant they made in 1961 was a covenant running with the land and that their liability on it terminated when they conveyed the property to Ms. Camalier in 1980. If there is any continuing liability on the covenant, they argued, it is that either of Ms. Camalier or Mr. and Mrs. Sindelar, to whom Ms. Camalier conveyed the property in December, 1983. Regarding the nature of the covenant to be a factual matter, however, the court submitted the issue to a jury, which returned a verdict for the Bells in the amount of $7,000.

From the judgment entered on that verdict and the court's refusal to grant a judgment n.o.v., the Gallaghers have brought this appeal. Although four issues are stated, three pertain to whether, as a matter of law, their 1961 covenant ran with the land. The Gallaghers contend that the nature of the covenant was an issue of law to be decided by the court, that it should not have been submitted to the jury, and that, on this record, the court should have declared the covenant to run with the land. If it ran with the land, they continue, their liability under it ended when they conveyed the property. The fourth issue challenges the admission into evidence of their 1980 indemnity agreement with Ms. Camalier.

### Nature of the Covenant

Covenants made by parties to the conveyance of an interest in land may be regarded as being either personal in nature or as running with the land. The difference, as observed in 5 R. Powell, *The Law of Real Property*, § 673[1], p. 60–36, "hinges upon whether the original covenanting parties' respective rights or duties can devolve upon their successors."

Normally, the question of whether a covenant runs with the land arises when either the party seeking to enforce the covenant is someone other than the original covenantee or when the party against whom enforcement is sought is someone other than the original covenantor. The issue then becomes whether the non-covenantee who has in some manner succeeded to the interest of the covenantee can enforce the covenant or, conversely, whether the non-covenantor who has succeeded to the interest of the covenantor is liable on it. This case is different. Here, the plaintiffs and the defendants are the original contracting parties. The Gallaghers are being asked to perform on a promise they made directly to the Bells.

The issue is still important, however, for, although the courts are not unanimous in this view, there is a body of law to the effect that, if the covenant runs with the land,

the liability of the covenantor ends when he conveys the burdened land. We shall explore this further at the end of this Opinion.

The earliest source generally cited for the concept of a covenant running with the land and being enforceable by or against persons other than the original contracting parties is *Spencer's Case,* 5 Co.Rep. 16a, 77 Eng.Rep. 72 (QB 1583). The plaintiff there leased certain property to S for a term of 21 years. S, for himself and his executors and administrators, promised in the lease that he, his executors, administrators, or assigns would build a brick wall on the premises. S assigned his leasehold interest to J, who then assigned it to Clark. When the wall was not built, Spencer sued Clark on the covenant. Although the Court denied recovery, it set out in its opinion a number of principles for determining when such extended liability would accrue. The two major criteria, known generally as the "in esse" and "touch and concern" tests, were summarized nearly three centuries later in *Lynn v. Mount Savage Iron Co.,* 34 Md. 603, 634–35 (1871), as follows:

"1st. That when the covenant extends to a thing in *esse,* parcel of the demise, the thing to be done by force of the covenant is in a manner annexed and appurtenant to the thing demised, and shall run with the land, and shall bind the assignee, although he be not bound by *express words* ; as if the lessee covenant to repair the houses, this is parcel of the contract, and extends to the supporting of the thing demised; but, because the covenant in that case was in respect of a thing which was not in *esse* at the time of the demise made, but to be newly built after, and therefore bound only the covenantor, his executors or administrators, *and not the assignee,* the covenant did not, by the law, annex. 2nd. But if the lessee had covenanted for himself *and his assigns,* that they would make a new wall upon some part of the thing demised, that forasmuch as it is to be done upon the land demised, that it should bind the assignee; for although the covenant doth extend to a thing to be newly made, yet

it is to be made upon the thing demised, and the assignee is to take the benefit of it, and therefore shall bind the assignee *by express words.*"

(Emphasis in original.)

The questions addressed in *Spencer's Case* have been before the courts many times and in many different contexts over the past 400 years, and, not unexpectedly, the principles laid down in that case have undergone some refinement. Powell notes that "[t]he elements most often said to be required for covenants to run at law are that: (1) the covenant 'touch and concern' the land; (2) the original covenanting parties intend the covenant to run; and (3) there be some form of privity of estate." A fourth requirement, "sometimes mentioned," is that the covenant be in writing. § 673[1], pp. 60–37, 60–38.

The Maryland cases, of which there are a plethora, seem to fall into four basic categories: leases containing covenants by the tenant to pay rent or taxes or to keep the demised property insured, or by the landlord, primarily in ground rent leases, to convey the reversion;[4] mortgages containing covenants by the mortgagor to pay the mortgage debt, keep the property insured, rebuild or repair in the event of damage, or pay ground rent and taxes;[5] covenants by the grantee in a deed to build or maintain some improvement or provide some service on the land conveyed;[6] and

---

**4.** *See Hintze v. Thomas,* 7 Md. 346 (1855); *Maughlin v. Perry,* 35 Md. 352 (1872); *Worthington v. Cooke,* 52 Md. 297 (1879); *Donelson v. Polk,* 64 Md. 501 (1886); *Nickel v. Brown,* 75 Md. 172 (1892); *Consumers' Ice Co. v. Bixler & Co.,* 84 Md. 437, 35 A. 1086 (1896); *Baltimore City v. Peat,* 93 Md. 696, 50 A. 152 (1901); *Hollander v. Central Metal Co.,* 109 Md. 131, 71 A. 442 (1909).

**5.** *See Thomas v. Von Kapff,* 6 G & J 372 (1834); *Glenn v. Canby,* 24 Md. 127 (1866); *Barron v. Whiteside,* 89 Md. 448, 43 A. 825 (1899); *Com. Bldg. Ass'n. v. Robinson,* 90 Md. 615, 45 A. 449 (1900).

**6.** *See Lynn v. Mount Savage Iron Co., supra,* 34 Md. 603; *Dawson v. Western Md. R. Co.,* 107 Md. 70, 68 A. 301 (1907); *Whalen v. Balto. & Ohio R. Co.,* 108 Md. 11, 69 A. 390 (1908); *Md. and Pa. R. Co. v. Silver,* 110 Md. 510, 73 A. 297 (1909).

cases in which a grantor or lessor imposes restrictions on the use of the land conveyed or leased for the benefit of other land.[7] Because each of these categories presents somewhat different considerations, we occasionally find the Court stressing one or two factors to the exclusion of others; but, on the whole, it seems that the four criteria mentioned by Powell are also required in Maryland.

### (a) *Touch and Concern*

■ The "touch and concern" test is a key one. As early as *Glenn v. Canby, supra,* 24 Md. at 130, the Court announced as "established doctrine" that "a covenant to run with the land must extend to the land, so that the thing required to be done will affect the quality, value, or mode of enjoying the estate conveyed, and thus constitute a condition annexed, or appurtunent to it. . . ." *See also Whalen v. Balto. & Ohio R. Co., supra,* 108 Md. at 20, 69 A. 390: "The question as to whether the covenant runs with the land does not depend on its being performed on the land itself, but its performance must touch and concern the land, or some right or easement annexed or appurtenant thereto. . . ."

Each covenant carries with it a burden (to the covenantor) and a benefit (to the covenantee), and the language used to determine whether the covenant "touches and concerns" the land sometimes depends on whether the assignee in question is the plaintiff or the defendant. The Maryland Court of Appeals, on several occasions, has defined the "touch and

---

7. *See McKenrick v. Savings Bank,* 174 Md. 118, 197 A. 580 (1938); *Turner v. Brocato,* 206 Md. 336, 111 A.2d 855 (1955); *Levy v. Dundalk Co.,* 177 Md. 636, 11 A.2d 476 (1940); *Gnau v. Kinlein,* 217 Md. 43, 141 A.2d 492 (1958). These cases are often decided on a basis other than whether the restriction constitutes a covenant running with the land, and indeed are based not on *Spencer's Case* but on equitable principles laid down in *Tulk v. Moxhay,* 2 Phil. 774, 41 Eng.Rep. 1143 (1848). *See, for example, Newbold v. Peabody Heights Co.,* 70 Md. 493, 501, 17 A. 372 (1889); *Turner v. Brocato, supra,* 206 Md. at 346, 111 A.2d 855; Powell, *supra,* § 673[1], p. 60–37; 2 *American Law of Property,* § 9.24, pp. 402–04 (1952); *but see Kirkley v. Seipelt,* 212 Md. 127, 131, 128 A.2d 430 (1957).

concern" test in terms of whether performance of the covenant will "tend necessarily to enhance [the] value [of the land] or render it more convenient or beneficial to the owners or occupants." *Whalen v. Balto. & Ohio R. Co.,* *supra,* 108 Md. at 20, 69 A. 390; *Md. and Pa. R. Co. v. Silver, supra,* 110 Md. at 516, 73 A. 297. That, of course, looks at the issue essentially from the benefit point of view. Powell, at § 673[2], p. 60–41, states that the generally accepted test for the "touch and concern" test is that proposed by Dean Harry Bigelow; i.e.,

"[I]f the covenantor's legal interest in land is rendered less valuable by the covenant's performance, then the burden of the covenant satisfies the requirement that the covenant touch and concern land. If, on the other hand, the covenantee's legal interest in land is rendered more valuable by the covenant's performance, then the benefit of the covenant satisfies the requirement that the covenant touch and concern land."

Both Tiffany (3 H. Tiffany, *The Law of Real Property,* (3d ed. (1939)) and the *Restatement of Property* (§ 537 (1944)) generally adopt this more complete way of viewing the criterion. Tiffany states, at § 854, p. 455,

"Ordinarily, ... a covenant is regarded as touching and concerning the land if it is of value to the covenantee by reason of his occupation of the land or by reason of an easement which he has in the land, or if it is a burden on the covenantor by reason of his occupation of the land." [8]

---

**8.** The *Restatement* test is not quite the same as that espoused by Dean Bigelow or Tiffany. It provides, in § 537, p. 3218:

"The successors in title to land respecting the use of which the owner has made a promise can be bound as promisors only if
(a) the performance of the promise will benefit the promisee or other beneficiary of the promise in the physical use or enjoyment of the land possessed by him, or
(b) the consummation of the transaction of which the promise is a part will operate to benefit and is for the benefit of the promisor in the physical use or enjoyment of land possessed by him,

Here, of course, we are concerned only with the running of the burden, for the party seeking to enforce the covenant is the original covenantee. There is no doubt that the covenantees would be benefited by performance of the promise; their interest in their land is obviously rendered more valuable by it. It is equally true that, in terms of Dean Bigelow's test, the Gallaghers' interest in their property was immediately and continually rendered less valuable by the covenant. Even under the *Restatement* benefit-oriented test, the fact is that, while the particular covenant was a detriment to the Gallaghers, the transaction from which that covenant arose was of benefit to them. In return for their promise, they received a right-of-way that, at least arguably, they did not otherwise have and that was essential to avoid their being landlocked. Appellees throughout have regarded the extension of that right-of-way as valuable consideration and have not suggested that it does not bear a reasonable relation to the burden imposed on the Gallaghers.

Covenants to pay money have often been found to run with the land. *See Chesapeake Ranch Club v. CRC Members*, 60 Md.App. 609, 615, 483 A.2d 1334 (1984); Powell, *supra*, § 675[2], p. 60–90; *American Law of Property*, *supra*, § 9.13, pp. 380–82; *compare Sanitary Facilities II v. Blum*, 22 Md.App. 90, 322 A.2d 228, *cert. denied* 272 Md. 748 (1974). In the cases cited in footnotes 4–7, *supra*, the Court of Appeals has found covenants to pay rent and taxes, to keep demised or mortgaged property insured, to

---

and the burden on the land of the promisor bears a reasonable relation to the benefit received by the person benefited."

This requires that some aspect of the promise be of benefit in the use and enjoyment of land. Either the promisee must be benefited in the enjoyment of his land or the transaction spawning the promise must benefit the promisor in the enjoyment of the servient land. It would seem that subsection (a) concerns the running of the benefit, whereas subsection (b) sets the standard for the running of the burden. Comment b, for example, states, in relevant part, that "[f]or the burden of a promise to run the promise must be one respecting the use of the land of the promisor." *Restatement, supra,* at p. 3219.

repair or rebuild such premises, and to build and maintain railroad depots and facilities on conveyed land to "touch and concern" the land. *See also Maher v. Cleveland Union Stockyards,* 55 Ohio App. 412, 9 N.E.2d 995 (1936). Certainly, this covenant has no lesser connection to the land. Under any of the tests noted, it clearly "touches and concerns" the land owned by the Gallaghers.

### (b) *Intent*

The second factor mentioned by Powell is whether the parties intended the covenant to run with the land. Both the *Restatement* (§ 531, pp. 3196–98) and Powell (§ 673[2][b], pp. 60–47, 60–48) make clear that the benefit or the burden of a covenant will not pass to a successor in interest unless the parties intended that result.[9] Unlike the "touch and concern" test, which looks objectively at the nature and quality of the covenant and seeks to measure the relationship between its performance and someone's enjoyment of land, the intention requirement "focuses on the subjective state of mind of the original covenanting parties." Powell, *supra,* at p. 60–49.

■ Subjective intent is generally a question of fact for resolution by a jury, and, thus, if the issue is in dispute, it is ordinarily inappropriate for a court to decide it on motion. *See Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980); *DiGrazia v. County Exec. for Mont. Co.,* 288 Md. 437, 445, 418 A.2d 1191 (1980). But that is not an absolute prohibition. Like any other question of fact, if, after viewing the evidence and all *reasonable* inferences from it in favor of

---

**9.** The parties' intent is a co-equal factor with the "touch and concern" criterion. Tiffany states that

"[t]he correct rule appears to be that the parties to the covenant may, by indicating an intention to that effect, prevent the covenant from running, although it is such that otherwise it would run, while if the covenant is one which does not touch and concern the land, the parties cannot make it run by indicating an intention or desire that it shall run."

3 Tiffany, *supra,* § 854, p. 461. Maryland seems to have adopted that view. *Glenn v. Canby, supra,* 24 Md. at 131. *See also Gnau v. Kinlein, supra,* 217 Md. at 48, 141 A.2d 492.

the non-moving party, the court is able to determine an answer as a matter of law, it may do so by granting a motion for judgment under Md.Rule 2–519 or a motion for judgment n.o.v. under Rule 2–532.

The intention of the parties, as to whether a covenant is personal to the covenanting parties or extends to their assignees, "may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent." *Gnau v. Kinlein, supra,* 217 Md. at 48, 141 A.2d 492, and cases cited therein. Powell concurs that intent is "sought in the language of [the] transaction, read in the light of the circumstances of its formulation," adding that "[t]echnical words are not generally vital; however, the presence of the word 'assigns' constitutes strong evidence of the devolutive intent." [10] Powell, *supra,* at p. 60–51. He continues:

"Judicial decisions as to whether a covenant was intended to be 'personal' or to possess the quality of devolution have often relied on particular factors to justify a finding that a covenant was not personal. Factors, for example, strongly favoring the running of the benefit include: (1) the retention of adjacent land by a grantor-convenantee; (2) the benefiting of retained land as a result of the agreement; and (3) the establishment of a

---

**10.** The importance of using the word "assigns" has fluctuated somewhat. In *Spencer's Case,* the Court held that, if the object of the covenant was not *in esse* when the covenant was made, the covenant did not run unless the covenantor's assigns were specifically bound. In *Lynn v. Mount Savage Iron Co., supra,* 34 Md. at 634–35, and *Md. and Pa. R. Co. v. Silver, supra,* 110 Md. at 516, 73 A. 297, the Court of Appeals seemed to adopt that view. *But compare Union Trust Co. v. Rosenburg,* 171 Md. 409, 416, 189 A. 421 (1937), where the Court quoted with seeming approval from 15 C.J. *Covenants* 1244, that "where a covenant is of such nature and character that it may run with the land, the words 'heirs and assigns' are not controlling, if it can reasonably be inferred from the language of the instrument that the parties intended that the covenant should run with the land." Which view the Court would maintain today is not important in this case, for the language of the covenant clearly extended to the assigns of the Gallaghers. If that is to be regarded as an absolute test, it was met.

common plan of development which includes land retained
by the grantor.   In some instances, the *nature* of the
covenant may require the conclusion that the requisite
intention for the running of the benefit is present.   The
factors which favor an inference that the burden shall
run include the permanent nature of the situation to be
produced by the performance of the covenant and the fact
that the covenant was made against a background of a
common plan of development."

Powell, *supra,* at pp. 60–54, –56 (footnotes omitted;  empha-
sis in original).

██   The record here reveals the following:  (1) by insert-
ing this same requirement in their contract with the Sisters,
appellees made clear their intent to impose the obligation on
whoever purchased the half-acre lot, not the Gallaghers in
particular;  (2) the covenant at issue was in conformance
with that requirement and simply confirmed the obligation
imposed on Mr. Gallagher by his contract with the Sisters;
(3) the covenant at issue expressly extends to the assigns of
the Gallaghers;  (4) that covenant was intended to benefit
adjacent land retained by the covenantee;  (5) the time for
performance was uncertain and would not necessarily occur
while the Gallaghers were in title;  (6) the Gallaghers have
consistently maintained that the covenant ran with the land;
(7) on July 20, 1983—before commencement of this litiga-
tion—appellees filed among the Land Records of Montgom-
ery County a Declaration of Covenant reciting the Galla-
ghers' sale to Ms. Camalier, asserting that "by virtue of
said conveyance, Deborah N. Camalier became the assignee
of the Gallaghers *and bound by the aforesaid Agreement
regarding pro rata payment of the cost of installation of
streets and utilities* " and attesting that the purpose of the
Declaration was "to memorialize the pro rata costs *attrib-
utable to the Property now owned by the said Deborah N.
Camalier* " (emphasis added);  (8) at trial, counsel for appel-
lees specifically characterized the 1961 agreement as "a
document that constitutes a covenant and runs with the
land";  and (9) also at trial, F. Meade Bell, one of the

appellees, acknowledged that, because of the inclusion of "heirs and assigns" in the 1961 agreement, he initially sought recovery from Ms. Camalier and that he set his sight on the Gallaghers only because of the indemnity agreement between her and the Gallaghers.

Each of these facts indicates that the covenant was intended to run with the land. Indeed, the last three enumerated above, taken together, constitute a virtual concession by appellees to that effect. Against that, appellees seek to draw an inference that the 1961 covenant was a personal one from (1) the "fact" that they already had a similar covenant running with the land by virtue of the clause in Mr. Gallagher's contract with the Sisters, and (2) the indemnity agreement between the Gallaghers and Ms. Camalier.

We do not regard such an inference as a *reasonable* one. As noted, the contract with the Sisters was not signed by Mrs. Gallagher, and the covenant therein was not included in the deed. It therefore did not directly bind her or her assigns. She became directly bound only by virtue of the 1961 agreement with appellees. If there is an inference to be drawn from the indemnity agreement, it seems to us that it is an unfavorable one to appellees. On this record, the only reasonable inference that can be drawn from the agreement is that Ms. Camalier recognized that, by taking title with knowledge of the recorded 1961 agreement, she would become liable on the covenant and that she desired to have recourse to the original covenantors. As noted, appellees, in their 1983 Declaration of Covenant, shared that view.

On this record, therefore, we think it clear as a matter of law that the parties intended the covenant at issue to run with the land and to bind the assigns of the Gallaghers.

### (c) *Privity*

■ The requirement that there be privity of estate between the parties in order that a covenant run with the land appears to stem not from *Spencer's Case,* which mentions

the concept of privity only in passing and in connection with leases and conveyances of personalty, but rather from *Webb v. Russell*, 3 T.R. 393, 100 Eng.Rep. 639 (KB 1789). The facts of that case were a bit complex and are not especially germane to what is now before us; what is important is Lord Kenyon's pronouncement that "[i]t is not sufficient that a covenant is concerning the land, but, in order to make it run with the land, there must be privity of estate between the covenanting parties." *Webb, supra,* 100 Eng.Rep. at 644. That requirement of privity, which in fact was present in *Spencer's Case,* became firmly ingrained in the Maryland law. *See Hintze v. Thomas, supra,* 7 Md. at 350–51; *Glenn v. Canby, supra,* 24 Md. at 130; *Donelson v. Polk, supra,* 64 Md. at 504; *Whalen v. Balto. & Ohio R. Co., supra,* 108 Md. at 20, 69 A. 390. The question is, what kind of privity is required?

Powell points out that there are at least three kinds of privity of estate that have been mentioned by the courts— mutual privity, requiring that the original parties have had a mutual and continuing interest in the same land; horizontal privity, requiring that the covenant be made in connection with the conveyance of an estate in fee from one of the parties to the other; and vertical privity, requiring only that "the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefited or burdened." Powell, *supra,* § 673[2], p. 60–64. He further observes that:

"Many modern cases still require some type of privity for covenants to run at law. Unfortunately, there is frequently no consistency as to the type of privity required even within a jurisdiction, and many courts just do not state which type of privity they require. According to one authority, as of 1970, six states which formerly required horizontal privity had abolished the requirement, and it had been expressly adopted in only one state in the twenty-seven years previous to 1970. Modern legal writ-

ers unanimously favor the abolition of at least mutual and horizontal privity."

Powell, *supra,* at p. 60–67 (footnotes omitted).

The modern view, rather clearly, is that no more than vertical privity is required. *See Orange & Rockland Util. v. Philwood Estates,* 52 N.Y.2d 253, 437 N.Y.S.2d 291, 295, 418 N.E.2d 1310, 1314 (1981). That is also the view of Judge Charles E. Clark, formerly of the Court of Appeals for the Second Circuit and one of the preeminent authorities on the law of covenants. *See* Clark, *Covenants and Interests Running with Land* (2d ed. 1947), p. 117; *also 165 Broadway Building v. City Investing Co.,* 120 F.2d 813, 816–17 (2d Cir.), *cert. denied* 314 U.S. 682, 62 S.Ct. 186, 86 L.Ed. 546 (1941). *See also* 3 Tiffany, *supra,* § 851, *but compare* 2 *American Law of Property, supra,* § 9.11.

We see nothing in the Maryland cases heretofore decided precluding our adoption of this modern and, to us, more rational view. Focusing on the precise relationship of the original contracting parties can create artificial results, causing covenants to be regarded as personal (and thus binding on persons who have long since conveyed the land or, conversely, unenforceable by successors to the covenantee) when the covenant touches and concerns the land and the parties clearly intended for it to run with the land. The "vertical privity" concept avoids that problem and focuses instead on the devolutional relationships, where, we think, the focus should be.

### (d) *Conclusion*

■ Upon this analysis, we conclude that the covenant in question—to pay a pro rata share of the cost of installing the streets adjacent to the property—was one that runs with the land.

### *Consequence*

■ The essence of a covenant running with the land was described in *Donelson v. Polk, supra,* 64 Md. at 504:

"The principle of law is a familiar one, that the liability of an assignee of a term to the original lessor, or those claiming under him, grows out of the privity of estate, and that such liability continues only so long as such privity of estate exists. So long as the privity of estate continues, the assignee is liable upon all covenants that *run with the land* ...; and for any breach of such covenants, the lessor may sue him during the continuance of the assignment. *But as his liability springs altogether from his relation to the land, it follows that when he severs that relation he puts an end to his liability for any future breaches of the covenant contained in the lease,* whether such covenants be expressed or implied. In regard to this there is no question or conflict of authority."

(Emphasis added.) *See also Union Trust Co. v. Rosenburg, supra,* 171 Md. at 415–20, 189 A. 421; *Com. Bldg. Ass'n v. Robinson, supra,* 90 Md. at 618, 45 A. 449; *Nickel v. Brown, supra,* 75 Md. at 184–85, 35 A. 1086; 5 Powell, *supra,* § 673[3], pp. 60–73, –74.

Those cases, however, involved actions against assignees of the original covenantor. Whether a different rule is applied where, as here, the original covenantor is the defendant is not altogether clear. Noting that the question has "not been extensively litigated," Powell observes, at § 673[3], that

"A liability continuing after the original covenantor had lost control of the burdened land would be harsh, and might well lessen the willingness of people to utilize covenants. It is not surprising, therefore, to find several courts holding that the conveyance of the burdened land ends the covenantor's liability. A few states have enacted statutes to this same effect. This result normally embodies the intention of the original parties reasonably inferable from the circumstances of the original covenant, giving due emphasis to the nature of the conduct promised. This is particularly true with respect to covenants to render services or to curtail the use of the burdened

land; but is less likely to be true in the case of covenants to pay money, where the personal credit of the original covenantor is an important factor."

(Footnotes omitted.) Tiffany also recognizes the conflict. *See* § 850.

The closest that the Court of Appeals has come to expressing a view on this question was in *Union Trust Co. v. Rosenburg, supra*, 171 Md. at 416–17, 189 A. 421. The issue there was whether an assignee of a mortgagor was liable on a covenant in the mortgage to pay taxes, and the answer, in the Court's view, depended on the intention of the original parties to the instrument. In that context, the Court observed:

"[I]n our view, it would be an illogical conclusion to hold that it was the intention of the original mortgagors to provide that their heirs, successors, or assigns should come into possession of the property and enjoy the benefit of the emoluments accuring therefrom, without at the same time incurring the obligations incident to its maintenance; or, stated differently, that it was the intention of the mortgagors to assume the whole obligation of the payment of taxes and charges, regardless of the passage of title in the mortgaged property to others. It might be added that it would be likewise illogical to conclude a similar intention on the part of the mortgagees, for the obvious reason that the covenant to pay, in itself, is dependent upon the financial responsibility of the covenantor, and that the passing of his title in the property to the successor would correspondingly weaken and in many cases destroy the security of the covenantee, if the covenant did not follow the property."

Although this does not directly address the problem now before us, it indicates an emphasis on the intention of the parties that is consistent with the view expressed by Powell. *See also City of Glendale v. Barclay*, 94 Ariz. 358, 385 P.2d 230 (1963), finding a continuing liability on the part of the original covenantor on the basis of intent. In that regard, the record here clearly indicates that the Bells were not

relying especially upon the credit of the Gallaghers in extracting the covenant. They wanted, and insisted upon, the undertaking from whomever purchased the burdened tract, and indeed turned to the Gallaghers only when they mistakenly concluded that Ms. Camalier was not liable because of her indemnity agreement. In a case similar on its facts to this one, the Pennsylvania Court concluded in *Leh v. Burke*, 231 Pa.Super. 98, 331 A.2d 755 (1974), that:

> "When a promise to do an affirmative act, such as in this case to make a monetary payment, is found to run with the land, the person in possession at the time the obligation matures is responsible for discharging it. Conversely, prior or subsequent owners of the property, *including the original covenantor*, are relieved of responsibility not arising contemporaneously with their interest in the land."

(Emphasis added.)

We need not, in this case, go so far as to announce such a rule as a matter of law, or indeed as to every kind of covenant that may run with the land. It will suffice to conclude only that the continuing liability of an original covenantor on a covenant of the type involved here will end upon his conveyance of the burdened property if the parties intended for that to be the case, and that the record here demonstrates such an intent. *Compare, however*, the uncritical and unsupported statement in a casenote to *McKenrick v. Savings Bank*, 174 Md. 118, 197 A. 580 (1938), in 2 Md.L.Rev. 265, 268 (1938), that "[a]s the covenantor's obligation is contractual, he always remains liable for any breaches whenever they occur."

It is evident that the liability of the Gallaghers to appellees on the 1961 covenant ended in 1980 when they conveyed their property to Ms. Camalier. Any liability they may have under their indemnity agreement—a matter not now before us and upon which we express no opinion—would flow to Ms. Camalier and not to appellees. The court therefore erred in not entering judgment in favor of the Gallaghers, as it was thrice requested to do.

JUDGMENT REVERSED;
APPELLEES TO PAY THE COSTS.